**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CITIZENS FOR RESPONSIBILITY AND
ETHICS IN WASHINGTON,

<em>Plaintiff</em>,

*v.*

U.S. DEP'T OF THE TREASURY, *ET AL.*,

<em>Defendant</em>.

Civil Action No. 20-cv-2256-CKK

<u>**DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**</u>

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 7, Defendants United States Department of the Treasury ("Treasury"), United States Postal Service ("USPS"), and United States Postal Service Office of Inspector General ("USPS OIG," collectively "Defendants") move for summary judgment. The reasons for the cross-motion are set forth in the attached memorandum of points and authorities, as well as the supporting declarations of Michelle A. Dickerman, Deputy Assistant General Counsel at the United States Department of the Treasury; Ryan A. Law, Deputy Assistant Secretary for Privacy, Transparency, and Records at the United States Department of the Treasury and USPS Chief Privacy and Records Management Officer Janine Castorina. A proposed order is also attached.

Dated June 10, 2021

Respectfully submitted,

BRIAN NETTER
*Deputy Assistant Attorney General*

ELIZABETH J. SHAPIRO
*Deputy Director*

/s/ *Christopher D. Dodge*
CHRISTOPHER D. DODGE
(MA Bar No. 696172)
*Trial Attorney*
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
Telephone: (202) 598-5571
Email: christopher.d.dodge@usdoj.gov

*Counsel for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CITIZENS FOR RESPONSIBILITY AND
ETHICS IN WASHINGTON,

*Plaintiff*,

*v.*

U.S. DEP'T OF THE TREASURY, *ET AL.*,

*Defendants*.

Civil Action No. 20-cv-2256-CKK

## DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................... 1

BACKGROUND ................................................................................................................... 2

I.      Plaintiff's FOIA Requests And Defendants' Responses ............................................. 2

      A.     The Treasury request and Treasury's response................................................. 2

      B.     The USPS request and USPS's response. ......................................................... 3

      C.     The USPS OIG request and USPS OIG's response. .......................................... 5

LEGAL STANDARD ............................................................................................................ 5

ARGUMENT ....................................................................................................................... 6

I.      Defendants Properly Withheld Records under FOIA Exemption 5 ................................. 6

      A.     Treasury's withholdings under Exemption 5 are pre-decisional and deliberative and are therefore protected by the deliberative process privilege........................... 8

      B.     USPS's withholdings are also predecisional and deliberative, and therefore also properly withheld under the deliberative process privilege. ............................... 14

              *1.*     *July 28, 2020 Board of Governors production.* ...................................... 14

              *2.*     *September 14, 2020 Postmaster General's Office production.* ............... 17

              *3.*     *February 12, 2021 Postmaster General's Office production.* ................. 19

              *4.*     *March 31, 2021 OIG production.* ............................................................ 21

II.     Defendants Properly Withheld Records under FOIA Exemption 6 ............................... 24

      A.     Treasury properly withheld Secretary Mnuchin's personal email address and Treasury alias email address under FOIA Exemption 6. ..................................... 25

      B.     USPS properly withheld limited amounts of employee personal identifying information under FOIA Exemption 6. ............................................................. 30

III.    Defendants Properly Withheld Records under FOIA Exemption 7 ............................... 32

      A.     Treasury properly withheld Secretary Mnuchin's alias email account under Exemptions 7(C), (E), and (F). ...................................................................... 32

      B.     USPS properly withheld United States Postal Inspector Service materials under Exemption 7(C) and (E)......................................................................................... 35

IV.   Defendants Complied With The Foreseeable Harm Standard In The FOIA Improvement Act of 2016………………………………………………………......37

V.    USPS Conducted An Adequate Search For Board of Governors' Records ..................... 40

CONCLUSION.................................................................................................................... 42

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Access Reps. v. DOJ,*
　926 F.2d 1192 (D.C. Cir. 1991) ............................................................ 6, 7, 15, 20

*Aguiar v. DEA,*
　865 F.3d 730 (D.C. Cir. 2017) ......................................................................... 6

*Airline Pilots Ass'n, Int'l v. USPS,*
　No. CIV.A. 03-2384 (ESH), 2004 WL 5050900 (D.D.C. June 24, 2004) ........................... 23

*Am. Ctr. for Law & Justice v. DOJ,*
　334 F. Supp. 3d 13 (D.D.C. 2018) .............................................................. 9, 16, 17

*Am. Immigr. Lawyers Ass'n v. Exec. Off. for Immigr. Rev.,*
　830 F.3d 667 (D.C. Cir. 2016) ................................................... 24, 25, 28, 31

*Am. Immigration Council v. DHS,*
　21 F. Supp. 3d 60 (D.D.C. 2014) ..................................................................... 9

*Am. Oversight v. Dep't of the Treasury,*
　474 F. Supp. 3d 251 (D.D.C. 2020) ............................................................ 12, 13

*Am. Postal Workers Union, AFL-CIO v. USPS,*
　742 F. Supp. 2d 76 (D.D.C. 2010) ..................................................................... 23

*Baldwin v. Dep't of Energy,*
　No. CV 18-1872 (EGS), 2020 WL 376563 (D.D.C. Jan. 23, 2020) ...................................... 26

*Banks v. DOJ,*
　813 F. Supp. 2d 132 (D.D.C. 2011) ..................................................................... 36

*Blackwell v. FBI,*
　646 F.3d 37 (D.C. Cir. 2011) ................................................................... 34, 36

*Braun v. USPS,*
　317 F. Supp. 3d 540 (D.D.C. 2018) ..................................................... 23, 31, 32

*Cause of Action Inst. v. DOJ,*
　330 F. Supp. 3d 336 (D.D.C. 2018) .................................................................. 9, 29

*Cause of Action Inst. v. Exp.-Imp. Bank of the United States,*
　No. CV 19-1915 (JEB), 2021 WL 706612 (D.D.C. Feb. 23, 2021) ............................... 21, 22

*Chem. Mfrs. Ass'n v. Consumer Prod. Safety Comm'n,*
　600 F. Supp. 114 (D.D.C. 1984) ..................................................................... 7

*Coastal States Gas Corp. v. Dep't of Energy,*
　617 F.2d 854 (D.C. Cir. 1980) ..................................................................... 14

*Comm. on Oversight and Gov't Reform, U.S. House of Representatives v. Lynch*,
   156 F. Supp. 3d 101 (D.D.C. 2016) ................................................................... 11

*Competitive Enter. Inst. v. Dep't of Treasury*,
   308 F. Supp. 3d 109 (D.D.C. 2018) ................................................................... 10

*Competitive Enter. Inst. v. EPA*,
   12 F. Supp. 3d 100 (D.D.C. 2014) ....................................................... 9, 28, 29, 30

*Competitive Enter. Inst. v. Off. of Sci. & Tech. Policy*,
   241 F. Supp. 3d 14 (D.D.C. 2017) ................................................................... 42

*Conservation Force v. Jewell*,
   66 F. Supp. 3d 46 (D.D.C. 2014), *aff'd*, No. 15-5131, 2015 WL 9309920
   (D.C. Cir. Dec. 4, 2015) ................................................................................. 27

*Consumers' Checkbook Ctr. for the Study of Servs. v. HHS*,
   554 F.3d 1046 (D.C. Cir. 2009) ................................................................. 28, 29

*Cooper v. DOJ*,
   169 F. Supp. 3d 20 (D.D.C. 2016) ............................................................. 34, 36

*Crestek, Inc. & Subsidiaries v. IRS*,
   322 F. Supp. 3d 188 (D.D.C. 2018) ................................................................. 12

*CREW v. DHS*,
   514 F. Supp. 2d 36 (D.D.C. 2007) ............................................. 14, 15, 22, 24

*CREW v. DOJ*,
   160 F. Supp. 3d 226 (D.D.C. 2016) ................................................................. 37

*CREW v. GSA*,
   No. CV 18-2071 (CKK), 2021 WL 1177797 (D.D.C. Mar. 29, 2021) ............... 20

*Ctr. for Pub. Integrity v. Dep't of Def.*
   486 F. Supp. 3d 317 (D.D.C. 2020) ................................................................. 27

*Ctr. for Pub. Integrity v. FEC*,
   332 F. Supp. 3d 174 (D.D.C. 2018) ................................................................. 11

*Day v. Dep't of State*,
   No. CV 17-1418 (EGS), 2020 WL 1078955 (D.D.C. Mar. 6, 2020) ................... 27

*DBW Partners, LLC v. USPS*,
   No. CV 18-3127 (RC), 2019 WL 5549623 (D.D.C. Oct. 28, 2019) ................... 23

*Defs. of Wildlife v. U.S. Border Patrol*,
   623 F.Supp.2d 83 (D.D.C. 2009) ..................................................................... 5

*Dep't of Def. v. FLRA*,
   510 U.S. 487 (1994) ....................................................................................... 28

iv

*Dep't of State v. Wash. Post Co.*,
　456 U.S. 595 (1982) .......................................................................................... 25

*DOJ v. Reps. Comm. For Freedom of Press*,
　489 U.S. 749 (1989) .......................................................................................... 36

*Elec. Frontier Found. v. DOJ*,
　890 F. Supp. 2d 35 (D.D.C. 2012) ...................................................................... 7

*Elec. Priv. Info. Ctr. v. CBP*,
　248 F. Supp. 3d 12 (D.D.C. 2017), *aff'd*, No. 17-5078, 2017 WL 4220339
　(D.C. Cir. Aug. 1, 2017) ................................................................................... 37

*Fitzgibbon v. CIA*,
　911 F.2d 755 (D.C. Cir. 1990) ........................................................................... 35

*Formaldehyde Inst. v. HHS*,
　889 F.2d 1118 (D.C. Cir. 1989) ........................................................................... 7

*Frank LLP v. CFPB*,
　327 F. Supp. 3d 179 (D.D.C. 2018) ................................................................... 36

*Freedom Watch, Inc. v. NSA*,
　49 F. Supp. 3d 1 (D.D.C. 2014) .................................................................... 28, 30

*Friedman v. United States Secret Serv.*,
　282 F. Supp. 3d 291 (D.D.C. 2017) ................................................................... 35

*Gold Anti-Trust Action Comm., Inc. v. Bd. of Governors of the Fed. Reserve Sys.*,
　762 F. Supp. 2d 123 (D.D.C. 2011) ..................................................................... 7

*Gov't Accountability Project v. Dep't of State*,
　699 F. Supp. 2d 97 (D.D.C. 2010) ............................................................... 26, 27

*Hall & Assocs. v. EPA*,
　No. CV 19-1095 (RC), 2020 WL 4673411 (D.D.C. Aug. 12, 2020) ........ 26, 27, 31

*Hamilton Sec. Grp. Inc. v. HUD*,
　106 F. Supp. 2d 23 (D.D.C. 2000), *aff'd* No. 00-5331, 2001 WL 238162
　(D.C. Cir. Feb. 23, 2001) .................................................................................. 18

*Heffernan v. Azar*,
　317 F. Supp. 3d 94 (D.D.C. 2018) ..................................................................... 18

*Hornbostel v. Dep't of Interior*,
　305 F.Supp.2d 21 (D.D.C.2003) .............................................................. 15, 18, 21

*Hunton & Williams LLP v. EPA*,
　248 F. Supp. 3d 220 (D.D.C. 2017) ................................................................... 41

*Hunton & Williams LLP v. EPA,*
    346 F. Supp. 3d 61 (D.D.C. 2018) ..................................................................... 12

*ICM Registry, LLC v. Dep't of Com.*,
    538 F. Supp. 2d 130 (D.D.C. 2008) ............................................................. *passim*

*In re Sealed Case*,
    121 F.3d 729 (D.C. Cir. 1997) ........................................................................... 7

*Jefferson v. DOJ,*
    284 F.3d 172 (D.C. Cir. 2002) ......................................................................... 32

*Jordan v. DOJ,*
    591 F.2d 753 (D.C. Cir. 1978) ........................................................................... 6

*Judicial Watch v. Export-Import Bank,*
    108 F. Supp. 2d 19 (D.D.C. 2000) ..................................................................... 7

*Judicial Watch, Inc. v. Dep't of State,*
    306 F. Supp. 3d 97 (D.D.C. 2018) ................................................................... 10

*Judicial Watch, Inc. v. Dep't of State,*
    875 F. Supp. 2d 37 (D.D.C. 2012) ................................................................... 30

*Judicial Watch, Inc. v. Dep't of Treasury,*
    796 F. Supp. 2d 13 (D.D.C. 2011) ................................................................... 20

*Judicial Watch, Inc. v. DHS,*
    736 F. Supp. 2d 202 (D.D.C. 2010) ........................................................ 9, 16, 17

*Judicial Watch, Inc. v. DOJ,*
    319 F. Supp. 3d 431 (D.D.C. 2018) ................................................................. 42

*Judicial Watch, Inc. v. DOJ,*
    432 F.3d 366 (D.C. Cir. 2005) ........................................................................... 6

*Judicial Watch, Inc. v. FDA,*
    449 F.3d 141 (D.C. Cir. 2006) ..................................................................... 7, 14

*Judicial Watch, Inc. v. Reno,*
    No. Civ. A 00-0723 (JR), 2001 WL 1902811 (D.D.C. Mar. 30, 2001) ...................... 9, 16, 17

*Kelly v. CIA,*
    No. CIV. 00-2498(TFH), 2002 WL 34463900 (D.D.C. Aug. 8, 2002) ..................... 10

*Landmark Legal Found. v. EPA,*
    959 F. Supp. 2d 175 (D.D.C. 2013) ................................................................. 41

*Lepelletier v. FDIC,*
    164 F.3d 37 (D.C. Cir. 1999) ........................................................................... 31

*Life Extension Found., Inc. v. IRS,*
   915 F. Supp. 2d 174 (D.D.C. 2013), *aff'd,* 559 F. App'x 3 (D.C. Cir. 2014) ...................... 22

*Martin v. DOJ,*
   488 F.3d 446 (D.C. Cir. 2007) ............................................................................ 36

*Mayer Brown LLP v. IRS,*
   562 F.3d 1190 (D.C. Cir. 2009) .......................................................................... 34

*Mead Data Cent., Inc. v. Dep't of Air Force,*
   566 F.2d 242 (D.C. Cir. 1977) ............................................................................ 21

*Military Audit Project v. Casey,*
   656 F.2d 724 (D.C. Cir. 1981) .............................................................................. 6

*Miller v. DOJ,*
   872 F. Supp. 2d 12 (D.D.C. 2012) ........................................................................ 6

*Milner v. Dep't of Navy,*
   562 U.S. 562 (2011) .......................................................................................... 33

*Mittleman v. King,*
   No. CIV. A. 93-1869 SSH, 1997 WL 911801 (D.D.C. Nov. 4, 1997) ................... 17

*Morley v. CIA,*
   508 F.3d 1108 (D.C. Cir. 2007) .......................................................................... 41

*Multi Ag Media LLC v. Dep't of Agric.,*
   515 F.3d 1224 (D.C. Cir. 2008) .......................................................................... 24

*Nat'l Ass'n of Home Builders v. Norton*,
   309 F.3d 26 (D.C. Cir. 2002) ............................................................................. 25

*Nat'l Ass'n of Retired Fed. Emps. v. Horner*,
   879 F.2d 873 (D.C. Cir. 1989) ............................................................................ 28

*NLRB v. Sears, Roebuck & Co.*,
   421 U.S. 132 (1975) ..................................................................................... 6, 15

*Odland v. FERC*,
   34 F. Supp. 3d 3 (D.D.C. 2014) ................................................................ 9, 10, 21

*Oglesby v. U.S. Dep't of Army*,
   920 F.2d 57 (D.C. Cir. 1990) ............................................................................. 41

*Pinson v. Lappin*,
   806 F. Supp. 2d 230 (D.D.C. 2011) .................................................................... 27

*Piper & Marbury, LLP v. USPS*,
   No. CIV.A. 99-2383JMFCKK, 2001 WL 214217 (D.D.C. Mar. 6, 2001) ............. 23

*Prechtel v. FEC,*
    330 F. Supp. 3d 320 (D.D.C. 2018) ................................................................. 29

*Price v. DOJ,*
    No. 18-CV-1339 (CRC), 2020 WL 3972273 (D.D.C. July 14, 2020) .................. 36

*Prison Legal News v. Samuels,*
    787 F.3d 1142 (D.C. Cir. 2015) ................................................................ 26, 30

*Pub. Citizen, Inc. v. OMB,*
    598 F.3d 865 (D.C. Cir. 2010) ........................................................................ 8

*Pub. Emps. for Env't Resp. v. EPA,*
    288 F. Supp. 3d 15 (D.D.C. 2017) .................................................................. 12

*Pub. Emps. For Env't Resp. v.  U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mexico,*
    740 F.3d 195 (D.C. Cir. 2014) ........................................................... 32, 33, 34

*Reliant Energy Power Generation, Inc. v. FERC,*
    520 F. Supp. 2d 194 (D.D.C. 2007) ................................................................ 18

*Reps. Comm. for Freedom of Press v. FBI,*
    877 F.3d 399 (D.C. Cir. 2017) ....................................................................... 41

*Roth v. DOJ,*
    642 F.3d 1161 (D.C. Cir. 2011) ..................................................................... 36

*Russell v. Dep't of the Air Force,*
    682 F.2d 1045 (D.C. Cir. 1982) ....................................................................... 6

*S. All. for Clean Energy v. Dep't of Energy,*
    853 F. Supp. 2d 60 (D.D.C. 2012) .................................................................. 21

*Schlefer v. United States,*
    702 F.2d 233 (D.C. Cir. 1983) ................................................................ 15,  20

*Schrecker v. DOJ,*
    349 F.3d 657 (D.C. Cir. 2003) ....................................................................... 35

*Shurtleff v. EPA,*
    991 F. Supp. 2d 1 (D.D.C. 2013) .............................................................. 27, 28

*Smith v. Dep't of Treasury,*
    No. 17-CV-1796 (TSC), 2020 WL 376641 (D.D.C. Jan. 23, 2020) ............... 30, 31

*Soghoian v. OMB,*
    932 F. Supp. 2d 167 (D.D.C. 2013) ................................................. 18, 20, 21, 22

*Sussman v. U.S. Marshals Serv.,*
    494 F.3d 1106 (D.C. Cir. 2007) ................................................................ 34, 36

*Techserve All. v. Napolitano,*
  803 F. Supp. 2d 16 (D.D.C. 2011) ............................................................ 18, 20, 21

*Trotter v. Ctr. for Medicare & Medicaid Servs.,*
  No. 1:19-CV-2008-RCL, 2021 WL 430912 (D.D.C. Feb. 8, 2021)...................................... 29

*United States Fish & Wildlife Serv. v. Sierra Club, Inc.,*
  141 S. Ct. 777 (2021) ................................................................................ 7, 8

*Weisberg v. DOJ,*
  627 F.2d 365 (D.C. Cir. 1980) ........................................................................ 6

*Weisberg v. DOJ,*
  705 F.2d 1344 (D.C. Cir. 1983) ...................................................................... 38

*Weisberg v. DOJ,*
  745 F.2d 1476 (D.C. Cir. 1984) .................................................................. 40, 41

*Wolfe v. HHS,*
  839 F.2d 768 (D.C. Cir. 1988)..............................................................39 U.S.C. 6, 20

**Statutes**

5 U.S.C. § 552(b)(6) ............................................................................ 23, 24, 25

5 U.S.C. § 552(b)(7) .................................................................................. 32

39 U.S.C. § 410 .................................................................................... 21, 23

**Rules**

Fed. R. Civ. P. 56 ..................................................................................... 6

**Other Authorities**

CNN, *Massive Postal Service Breach Hits Employees and Customers* (Nov. 10, 2014),
  https://www.cnn.com/2014/11/10/politics/postal-service-security-breach/index.html.......... 31

House Select Subcommittee on the Coronavirus Crisis, *Hybrid Hearing with Treasury Secretary
  Steven T. Mnuchin* (Sept. 1, 2020), https://coronavirus.house.gov/subcommittee-
  activity/hearings/hybrid-hearing-treasury-secretary-steven-t-mnuchin ...................... 10

H.R. Rep. No. 89-1497 at 11 (1966)........................................................................ 25

NPR, *More Than 800,000 Postal Service Employees Victims of Data Breach* (Nov. 10, 2014),
  https://www.npr.org/sections/thetwo-way/2014/11/10/363074340 .........................................31

S. Rep. No. 89-813 (1965)................................................................................ 13

TechRepublic, *New Phishing Email Campaign Impersonates US Postal Service to Deliver Malware* (Nov. 14, 2019), https://www.techrepublic.com/article/new-phishing-email-campaign-impersonates-us-postal-service-to-deliver-malware/ ............................................. 31

Treasury, *Role of the Treasury*, https://home.treasury.gov/about/general-information/role-of-the-treasury ......................................................................................................... 32

USPS, Board of Governors Announces Selection of Louis DeJoy to Serve as Nation's 75th Postmaster General (May 6, 2020), https://about.usps.com/newsroom/national-releases/2020/0506-bog-announces-selection-of-louis-dejoy-to-serve-as-nations-75th-postmaster-general.htm ........................................................................................ 16, 17

USPS OIG, *About the OIG*, https://www.uspsoig.gov/about-us/about-oig ................................... 4

USPS OIG, Audit Report: Assessment of Overtime Activity [Report No. 20-209-R20] (Aug. 25, 2020), https://www.uspsoig.gov/sites/default/files/document-library-files/2020/20-209-R20.pdf ............................................................................................................................. 19

USPS OIG, Auditor Report: Delivery Vehicle Acquisition Strategy [Report No. 19-002-R20] (Aug. 12, 2020), https://www.uspsoig.gov/sites/default/files/document-library-files/2020/19-002-R20.pdf .................................................................................................................... 19

**INTRODUCTION**

This Freedom of Information Act ("FOIA") case concerns Plaintiff Citizens for Responsibility and Ethics in Washington's ("CREW") broad request to the Department of the Treasury ("Treasury"), United States Postal Service ("USPS"), and USPS Office of the Inspector General ("USPS OIG") for records concerning election mail during the 2020 primary and general elections, as well as records concerning the appointment of Louis DeJoy as Postmaster General of the United States. The government has worked diligently to collect, review, process, and release over 1,500 pages of records to CREW. After Defendants released these records and indicated that no further responsive records remained to be processed, CREW indicated that it intended to challenge a limited set of withholdings by two Defendants—Treasury and USPS—primarily under Exemption 5, and to a lesser extent Exemptions 6 and 7. CREW also later indicated that it intended to challenge a narrow aspect of USPS's search for records. Subsequent to these challenges, both USPS and Treasury re-reviewed their withholdings and made certain additional releases in order to further narrow the scope of the issues at summary judgment.

What responsive records remain withheld or redacted after this additional review constitute core Exemption 5, Exemption 6, and Exemption 7 withholdings that, if released, would cause foreseeable harm to USPS and Treasury. With respect to Exemption 5, the lion's share or the withholdings reflect internal agency discussion or thinking about future or ongoing policy issues, or internal agency discussion about how to respond to media or Congressional inquiries—categories of records long held to be within the ambit of Exemption 5. As to Exemption 6, the dispute primarily concerns Treasury's withholding of the user name portion of a non-public facing "alias" email account for former Secretary Mnuchin that, if released, would likely reveal the current non-public "alias" email account used by Secretary Yellen to conduct agency business. The Exemption 6 dispute further concerns USPS's withholding of work email addresses of USPS employees, for which CREW has identified no public interest in disclosure. And the limited Exemption 7 claims at issue again concern former Secretary Mnuchin's alias email address user name as well as several U.S. Postal Inspector Service records. The issues now before the Court

1

are therefore limited but important.  For the reasons below, the Court should enter summary judgment on behalf of Defendants.

## BACKGROUND

### I.    Plaintiff's FOIA Requests And Defendants' Responses

CREW's amended complaint concerns three FOIA requests it sent to Treasury, USPS, and USPS OIG, respectively.  *See* Am. Compl., ECF No. 6 ¶ 1.  Each request generally concerns voting by mail during the 2020 primary and general elections, as well as the appointment of Louis DeJoy as Postmaster General of the United States.  *Id.*

### A.    The Treasury request and Treasury's response.

CREW issued a request to Treasury on June 22, 2020, seeking six categories of records that, broadly speaking, concerned voting by mail; the retirement of former Postmaster General Megan Brennan; and the appointment of Louis DeJoy as Postmaster General.  *See* Am. Compl. ¶ 16.  Treasury acknowledged receipt of CREW's request on June 26, 2020 and issued an interim response to CREW on July 29, 2020.  *Id.* ¶¶ 17-18.  The interim response included three records that Treasury released in full to CREW.  *Id.* ¶ 18.

Treasury continued producing records to CREW after initiation of litigation.  In total, Treasury has produced 844 pages to CREW.  *See* Declaration of Michelle A. Dickerman ("Dickerman Decl.") ¶ 13.  After CREW indicated that it intended to narrowly challenge a small number of records over which Treasury asserted various FOIA exemptions, Treasury re-released 49 pages of documents with more limited redactions on a discretionary basis.  *Id.* ¶ 16.  Although a strong basis exists for asserting exemptions over those records, Treasury nonetheless released them on a discretionary basis in a good faith effort to accommodate CREW's request and to narrow the scope of the issues at summary judgment.  *Id.*

Treasury and CREW constructively met and conferred throughout the litigation to discuss the scope of Treasury's search for, and production of, records responsive to CREW's request.  *See, e.g.*, ECF Nos. 11-17 (joint status reports).  CREW indicated at that time that it does not intend to challenge the adequacy of Treasury's search for materials.  *See* Dickerman Decl. ¶ 15.  CREW

does intend to challenge redactions that Treasury applied to its records primarily under Exemption 5, as well its withholding of former Secretary Mnuchin's personal email address and non-public facing Treasury email address user name under Exemptions 6 and 7.  *See id*. ¶¶ 16-18.

In preparing this motion for summary judgment, Treasury observed several gaps in its earlier searches that ultimately proved to be inconsequential.  *First*, while the majority of CREW's requests to Treasury, consisting of 6 individual items ("Items"),[1] seek records from between September 1, 2019 and May 8, 2020, *see* Am. Compl. ¶ 16(3)-(6), Items 1 and 2 seek records from January 1, 2019 to either May 28, 2020 or to the present, *id.* ¶ 16(1)-(2).  Treasury recently discovered that, for these later Items, it conducted a search beginning from September 1, 2019 rather than January 1, 2019.  *See* Dickerman Decl. ¶¶ 7-9.  Treasury promptly conducted a supplemental search for records responsive to these items between January 1, 2019 and September 1, 2019, which yielded eight non-responsive documents.  *See id.  Second*, in reviewing its search, Treasury also discovered that it had limited searches for email records in response to Items 5 and 6 to only a single custodian, despite previously pulling the relevant Outlook files for all custodians identified in CREW's request.  *See id*. ¶ 10.  Treasury subsequently ran a supplemental search for records including the full slate of custodians identified in CREW's items, which yielded no additional search hits for Item 5 and three additional search hits for Item 6, all of which were non-responsive.  *See id*.

### B.     The USPS request and USPS's response.

CREW sent a request to USPS on June 16, 2020 seeking ten categories of records.  *See* Am. Compl. ¶ 23.  These requests generally concerned materials relating to voting by mail that were prepared for former Postmaster General Brennan, Postmaster General DeJoy, Congress-members of their staff, the USPS OIG, the USPS Board of Governors, any state governors or their staff, as well as records relating to the departure of Postmaster General Brennan and the appointment of Postmaster General DeJoy.  *Id.*  USPS acknowledged the request on July 6 and

---

[1] Though these Items were not numbered in CREW's FOIA request, Defendants refer to them here in the numeric order in which they appear in the request.

further responded on July 13, 2020, explaining that it was referring different items in CREW's request to various USPS components, including the Postmaster General's Office, the Government Relations and Public Policy group, the Board of Governors, and the Chief Marketing and Sales Officer. *Id.* ¶ 25. USPS also referred one item to USPS OIG, which is an independent agency within the Postal Service. *Id.*; *see generally* USPS OIG, *About the OIG*, *available at* https://www.uspsoig.gov/about-us/about-oig.[2]

The Chief Marketing and Sales Officer responded to CREW by explaining that its requests were too broad to perform a reasonable search, and asked CREW to narrow or clarify its request. *See* Am. Compl. ¶ 26. The Board of Governors responded to CREW's request on July 28, 2020, releasing 39 pages of records subject to redactions under Exemptions 5 and 6. *Id.* ¶ 30 ("July 28, 2020 Board of Governors Production").[3] USPS subsequently released 7 pages of these records without any redactions. *See* Declaration of Janine Castorina ("Castorina Decl.") ¶ 10. USPS further released additional records in a good faith effort to narrow the issues at summary judgment. *Id.* ¶ 11.

USPS and its various components have, to date released nearly 750 pages of material to CREW in response to its request. *See* Castorina Decl. ¶ 16. CREW has indicated that its challenges to USPS's production concern certain portions of the July 28, 2020 Board of Governors Production; a September 19, 2020 Postmaster General's Office Production; a February 21, 2021 Postmaster General's Office Production; and a March 31, 2021 production from USPS in response to the item initially routed to the USPS OIG. CREW challenges USPS's search for documents only to the limited extent that it alleges USPS did not adequately search the personal email

---

[2] As described in the parties' joint status reports, although one item in CREW's request to USPS was initially referred to USPS OIG, the materials released in response to that item were ultimately processed and released by USPS itself in response to the FOIA request sent to USPS. *See, e.g.*, Fifth Joint Status Report, ECF No. 15 at 2. USPS therefore addresses the propriety of the withholdings from those records here.

[3] CREW subsequently administratively appealed the adequacy of the Board of Governors' search as well as its assertion of Exemption 5 over the withholdings. *See* Am. Compl. ¶ 31. On September 14, 2020, the Office of the General Counsel, Federal Compliance affirmed the Board of Governors' initial response. *See* Answer, ECF No. 10 ¶ 32.

accounts of the Board of Governors.  CREW has further indicated it intends to challenge redactions that USPS applied to certain records in the four productions above under Exemptions 5, 6, and 7, but not under Exemption 3.

In reviewing materials in advance of this motion, USPS counsel determined that three of the five documents challenged by CREW in the March 31, 2021 production required amended redactions.  *See* Castorina Decl. ¶¶ 25-28.  As a result of these amended redactions, USPS is now (1) releasing previously withheld portions of these documents; (2) further asserting Exemption 3 over several additional portions of these documents; and (3) continuing to assert Exemption 5 alone over other portions of these documents.  *Id.*

### C.    The USPS OIG request and USPS OIG's response.

CREW submitted a FOIA request to USPS OIG on June 16, 2020 seeking five categories of documents.  *See* Am. Compl. ¶ 35.  The request generally sought materials prepared by USPS OIG employees concerning voting by mail for Postmaster General DeJoy and for members of Congress or their staff; other kinds of USPS OIG documents concerning voting by mail; and any communications between USPS OIG and members of Congress or their staff concerning Louis DeJoy's appointment as Postmaster General.  *Id.*

USPS OIG's search yielded 104 pages of responsive materials, including 101 pages that could be produced in their entirety, which the agency attempted to release to CREW on July 31, 2020 via email.  *See* First Joint Status Report, ECF No. 11 at 3-4.  Due to a typographical error, CREW did not receive the email at that time.  *Id.*  USPS OIG subsequently re-released the records to CREW on October 8, 2020.  CREW has indicated that it does not intend to challenge USPS OIG's production.

### LEGAL STANDARD

"FOIA cases typically and appropriately are decided on motions for summary judgment." *Defs. of Wildlife v. U.S. Border Patrol*, 623 F.Supp.2d 83, 87 (D.D.C. 2009).  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Aguiar v. DEA*,

865 F.3d 730, 734-735 (D.C. Cir. 2017). "An agency may be entitled to summary judgment in a FOIA case if it demonstrates that no material facts are in dispute, it has conducted an adequate search for responsive records, and each responsive record that it has located has either been produced to the plaintiff or is exempt from disclosure." *Miller v. DOJ*, 872 F. Supp. 2d 12, 18 (D.D.C. 2012) (citing *Weisberg v. DOJ*, 627 F.2d 365, 368 (D.C. Cir. 1980)).

The Court may award summary judgment in a FOIA action solely on the basis of agency declarations. Those declarations should describe "the documents and the justifications for nondisclosure with reasonably specific detail," that "demonstrate that the information withheld logically falls within the claimed exemption[s]," and that are "not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981) (footnote omitted).

## ARGUMENT

### I.     Defendants Properly Withheld Records under FOIA Exemption 5

Exemption 5 protects deliberative process information from release. *See Judicial Watch, Inc. v. DOJ*, 432 F.3d 366, 367 (D.C. Cir. 2005). The deliberative process privilege is a "long-recognized privilege" intended to "prevent injury to the quality of agency decisions" by permitting "the withholding of all papers which reflect the agency's group thinking in the process of working out its policy." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 151 (1975). The privilege "encourage[s] the frank discussion of legal and policy issues within the government." *Access Reps. v. DOJ*, 926 F.2d 1192, 1194 (D.C. Cir. 1991) (quoting *Wolfe v. HHS*, 839 F.2d 768, 773 (D.C. Cir. 1988) (en banc)) (internal quotation marks omitted). It also "protects the public from the confusion that would result from premature exposure to discussions occurring before the policies affecting it had actually been settled upon" and ensures the "integrity of the decision-making process" by allowing agency officials to be judged for their final decisions, "not for matters they considered before making up their minds." *Russell v. Dep't of the Air Force*, 682 F.2d 1045, 1048 (D.C. Cir. 1982) (quoting *Jordan v. DOJ*, 591 F.2d 753, 772-773 (D.C. Cir. 1978)).

This privilege allows the Government to "withhold documents and other materials that

would reveal 'advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997) (citations omitted).  Courts give agencies a wide berth in determining what is "part of the agency give-and-take . . . by which the decision itself is made." *Chem. Mfrs. Ass'n v. Consumer Prod. Safety Comm'n*, 600 F. Supp. 114, 118 (D.D.C. 1984) (citations omitted).  "The [agency] is better situated than . . . [the] Court to know what confidentiality is needed" to prevent injury to agency decision-making.  *Id*.  Courts are "reluctant to force agencies to expose their decisionmaking processes." *Gold Anti-Trust Action Comm., Inc. v. Bd. of Governors of the Fed. Reserve Sys.*, 762 F. Supp. 2d 123, 135 (D.D.C. 2011).

"Two requirements are essential to the deliberative process privilege: the material must be predecisional and it must be deliberative." *In re Sealed Case*, 121 F.3d at 737; *see also Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 151 (D.C. Cir. 2006) ("We deem a document predecisional if it was generated before the adoption of an agency policy and deliberative if it reflects the give-and-take of the consultative process.").  To establish that a document is protected by the privilege, "the agency need not point to an agency final decision, but merely establish what deliberative process is involved, and the role that the documents at issue played in that process." *Judicial Watch v. Export-Import Bank*, 108 F. Supp. 2d 19, 35 (D.D.C. 2000) (citing *Formaldehyde Inst. v. HHS*, 889 F.2d 1118, 1223 (D.C. Cir. 1989)).  An agency need not "identify a specific decision in connection with which a memorandum is prepared." *See Access Reps.*, 926 F.2d at 1196 (holding that the "exemption does not turn on the ability of an agency to identify a specific decision in connection with which a memorandum is prepared" because "[a]ny requirement of a specific decision after the creation of the document would defeat the purpose of the exemption." (citation omitted)); *Elec. Frontier Found. v. DOJ*, 890 F. Supp. 2d 35, 52 (D.D.C. 2012) (withheld briefing materials need only have contributed to a decision-making process, not necessarily a particular decision).  Moreover, a "document is not final solely because nothing else follows it" as "[s]ometimes a proposal dies on the vine." *United States Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777, 786 (2021).

**A.     Treasury's withholdings under Exemption 5 are pre-decisional and deliberative and are therefore protected by the deliberative process privilege.**

CREW has indicated that it intends to challenge seven Exemption 5 claims asserted by Treasury.  But the withholdings it challenges fall within the core of the deliberative process privilege, as each "reflect[s] the give and take of the deliberative process" at Treasury as it formulated policies during the time period covered by CREW's request.  *Pub. Citizen, Inc. v. OMB*, 598 F.3d 865, 876 (D.C. Cir. 2010).  Forcing Treasury to release these sensitive deliberative materials would foreseeably chill agency decision-making and undermine the ability of Treasury officials to candidly discuss critical policy matters.  *See* Dickerman Decl. ¶ 20.

For example, CREW's first challenge is to document Treasury2 (UST_000550-553), an email between then-Secretary Mnuchin and several treasury employees about formulating a response to media coverage addressing the funding of the Postal Service in the run-up to the election.  *See* Treasury Vaughn Index at Treasury2.  The Treasury employee forwarded the coverage to Secretary Mnuchin "for his awareness," as the media coverage encouraged viewers to directly contact the Secretary.  *See* UST_000550-553; Treasury Vaughn Index at Treasury2. Secretary Mnuchin responded with a question to the employee about a potential response.  *Id*.  The employee responded with her views on a possible response, labelling her answer as "Draft/deliberative/predecisional."  Treasury2.  But she did not offer the Secretary any finalized response to the media inquiry that was ultimately made public, as reflected by her labeling the thoughts as "Draft" and "predecisional."  *Id.*

This sort of internal email correspondence formulating a response to media inquiries about ongoing agency operations is protected by the deliberative process privilege.  Courts have "noted on more than one occasion that the deliberative-process privilege covers agency deliberations on how to respond to media inquiries regarding agency actions, as well as discussions about press coverage of existing agency policies and suggested talking points about how to answer questions regarding the duties assigned to agency employees."  *Cause of Action Inst. v. DOJ*, 330 F. Supp. 3d 336, 352 (D.D.C. 2018) (internal quotation marks omitted); *see also Am. Immigration Council v. DHS*, 21 F. Supp. 3d 60, 75 (D.D.C. 2014); *Competitive Enter. Inst. v. EPA*, 12 F. Supp. 3d 100,

118 (D.D.C. 2014); *cf. Odland v. FERC*, 34 F. Supp. 3d 3, 20 (D.D.C. 2014) (holding that deliberative-process privilege applied to intra-agency emails considering agency's response to congressional inquiry). The email correspondence in Treasury2 was "generated as part of a continuous process of agency decision making, *viz.*, how to respond to on-going inquiries" about Treasury's funding of USPS in the run up to the 2020 election. *Judicial Watch, Inc. v. DHS*, 736 F. Supp. 2d 202, 208 (D.D.C. 2010). The discussion is therefore "properly withheld under Exemption 5." *Id.*; *see also Am. Ctr. for Law & Justice v. DOJ*, 334 F. Supp. 3d 13, 21 (D.D.C. 2018) ("courts have generally found that documents created in anticipation of press inquiries are protected"); *Judicial Watch, Inc. v. Reno*, No. Civ. A 00-0723 (JR), 2001 WL 1902811, at *3 (D.D.C. Mar. 30, 2001) (noting deliberative process privilege "extend[s] to recommendations and decisions concerning the sort of continuing and follow-up issues" such as "how to handle press inquiries and other public relations issues").

CREW's challenge to Treasury4 (UST_000794-795) fails for substantially the same reasons. That document is an email chain between a Treasury Senior Advisor for Public Affairs and a Counselor to Secretary Mnuchin concerning how to respond to a media inquiry from an ABC News reporter asking about funding for mail-in voting efforts in Michigan and Nevada. *See* Treasury Vaughn Index at Treasury4. Treasury withheld three sentences in the email chain reflecting predecisional and deliberative discussion of how to formulate a response to the journalist's inquiry. *Id.* This portion of the exchange is therefore also "properly withheld under Exemption 5." *Judicial Watch*, 736 F. Supp. 2d at 208; *see also Am. Ctr. for Law & Justice*, 334 F. Supp. 3d at 21.

The next document that CREW challenges, Treasury3 (UST_000791-793), concerns internal USPS deliberations that were forwarded to the Treasury. *See* Treasury Vaughn Index at Treasury3; Castorina Decl. ¶ 31. The information concerned an "initial list" of priority funding requests from USPS for modernization efforts at the Postal Service. *See* Castorina Decl. ¶ 31; *see also* UST_00791-793. The email therefore reflects USPS's initial, non-final priorities for ongoing modernization efforts. *See* Castorina Decl. ¶ 31. Documents reflecting an agency's non-final, and

9

not yet implemented or funded, policy priorities are predecisional because they precede actual finalization and implementation of the priorities and are further deliberative because they reflect internal agency discussion thinking about agency policy.  *See, e.g.*, *Competitive Enter. Inst. v. Dep't of Treasury*, 308 F. Supp. 3d 109, 119 (D.D.C. 2018) (recognizing that "draft office priorities can be reliably grounded in a predecisional and deliberative process without further inquiry"); *cf. Kelly v. CIA*, No. CIV. 00-2498 (TFH), 2002 WL 34463900, at *9 (D.D.C. Aug. 8, 2002) (finding document protected under deliberative process privilege where it "contain[ed] candid, pre-decisional comments on the potential availability of Agency funding").

The next document challenged by CREW, Treasury5 (UST_000804), is an August 28, 2020 proposed agenda sent by Treasury employee Frederick Vaughan to employee Alexandra Gaiser on August 27, 2020.  *See* UST000799 (showing agenda attachment).[4]  The agenda, which is also labelled "Draft/Deliberative/Predecisional," concerns preparations for Secretary Mnuchin's testimony at a September 1, 2020 hearing of the House Select Subcommittee on the Coronavirus Crisis.  *See* Treasury Vaughn Index at Treasury5; *see also* House Select Subcommittee on the Coronavirus Crisis, *Hybrid Hearing with Treasury Secretary Steven T. Mnuchin* (Sept. 1, 2020), https://coronavirus.house.gov/subcommittee-activity/hearings/hybrid-hearing-treasury-secretary-steven-t-mnuchin.  The agenda was circulated in tandem with other "hearing prep" materials, as reflected in Mr. Vaughan's email.  *See* UST000799.

The agenda is pre-decisional because it concerns the agency's preparatory efforts for the hearing, and it is similarly deliberative because it reflects the give-and-take of those efforts.  The agenda was part of ongoing deliberative exchanges "discussing prospective responses to the congressional inquiries" about Treasury's COVID-19 relief efforts.  *Odland*, 34 F. Supp. 3d at 20 (quoting Vaughn Index and upholding Exemption 5 withholding); *see also Judicial Watch, Inc. v. Dep't of State*, 306 F. Supp. 3d 97, 115 (D.D.C. 2018) ("Courts in this jurisdiction have repeatedly concluded that talking points prepared for use in congressional testimony are deliberative and

---

[4] Because Treasury5 and Treasury7 are withheld in full, Treasury has not included them in the compilation of challenged materials attached to the Declaration of Michelle A. Dickerman.

predecisional documents subject to FOIA exemption 5." (collecting cases)).  The agenda reflects "the Department's internal deliberations about how to respond to . . . Congressional inquiries" and thus is "protected by the deliberative process privilege."  *Comm. on Oversight and Gov't Reform, U.S. House of Representatives v. Lynch*, 156 F. Supp. 3d 101, 112 (D.D.C. 2016).  Further still, courts typically find that such agendas are "necessarily predecisional and inherently deliberative" because they show what "staff are suggesting the topics to be discussed at the meeting."  *Ctr. for Pub. Integrity v. FEC*, 332 F. Supp. 3d 174, 180 (D.D.C. 2018); *see also ICM Registry, LLC v. Dep't of Com.*, 538 F. Supp. 2d 130, 138 (D.D.C. 2008) (information reflecting "key issues to be addressed at an upcoming meeting is deliberative and predecisional").  That is also the case here, as the agenda reflects what Treasury employees believed to be the key issues to discuss and prepare for ahead of the Secretary's testimony to Congress.  *See* Treasury Vaughn Index at Treasury5.

The fifth Treasury document that CREW challenges, Treasury6 (UST_000833-835), is a January 20, 2020 "Note for Secretary Mnuchin" prepared by his Deputy Chief of Staff, J. Baylor Myers.  The note "summarizes [Secretary Mnuchin's] accomplishments" over his three years as Secretary.  *Id.*  The document addresses various Treasury initiatives across the federal government, addressing each initiative section-by-section with alphabetic section headers.  Treasury produced in full the responsive portion of the note on pages 40-41 that addresses "J. United States Postal Service (USPS) Reform."  *Id.*  The *entirety* of the responsive portion of the document on the Postal Service is un-redacted and was produced to CREW.  *See* Treasury Vaughn Index at Treasury6.  The redacted portions of the note fall under different alphabetic section headers and address topics unrelated to the Postal Service, including tax and domestic finance policy matters that are non-responsive to CREW's request and anyways properly withheld under Exemption 5.

Setting aside that these portions of the documents are non-responsive to CREW's request to Treasury,[5] they are appropriately withheld under Exemption 5 because they exclusively concern

---

[5] These portions of Treasury 6 should not be in dispute; CREW previously agreed that Treasury did not need to process and release non-responsive portions of this otherwise lengthy document in order to facilitate more prompt release of responsive material.  *See* Dickerman Decl. ¶ 12.

the "goals" and "next steps" of ongoing agency initiatives.  *See* Treasury Vaughn Index at Treasury6.  The redacted portions do *not* describe completed or finalized policy accomplishments. *Id.*  For example, the first redaction describes "next steps" that Treasury officials planned to undertake with respect to the underlying international tax policy.  *Id.*  Portions of the second redaction similarly describe "next steps" that Treasury officials planned to take in pursuit of the specific policy being described, while the remaining portions define forward-looking agency "goals" of the agency on two explicit policy matters.  *Id.*

A description of proposed next steps or goals, from a subordinate to his superior, in pursuit of specific policy initiatives is a paradigmatic example of deliberative process.  *See, e.g., Am. Oversight v. Dep't of the Treasury*, 474 F. Supp. 3d 251, 270 (D.D.C. 2020) (upholding Treasury's assertion of deliberative process privilege over a document that "propose[d] next steps and ma[de] recommendations on specific initiatives under consideration"); *Hunton & Williams LLP v. EPA*, 346 F. Supp. 3d 61, 82 (D.D.C. 2018) (finding deliberative process privilege applied to "suggestions from a subordinate to his superior for next steps he should take"); *Pub. Emps. for Env't Resp. v. EPA*, 288 F. Supp. 3d 15, 24 (D.D.C. 2017) (upholding Exemption 5 withholding over records that "that evaluate proposed policy options, suggest next steps for the agency, or seek advice from other EPA components about policy alternatives").  In sum, the Note's discussion "about what next steps the [agency] should take" on identifiable policy measures "enjoy the protection of the deliberative process privilege." *Crestek, Inc. & Subsidiaries v. IRS*, 322 F. Supp. 3d 188, 197 (D.D.C. 2018).

The sixth Treasury document that CREW challenges, Treasury7 (UST000840-843), is a May 6, 2020 email chain between the Secretary, then-White House Chief of Staff Mark Meadows, and a third senior government official discussing draft versions of then-pending COVID-19 relief legislation, as well as the White House's strategic approach to engaging Congress on such legislation.  The email discloses high-level strategic deliberations about ongoing, non-finalized legislative efforts and further reveals the White House's role and strategic efforts related to such legislation. *See* Treasury Vaughn Index at Treasury7.  It discusses sensitive aspects of the pending

legislation such as its contents, timing, and strategy.  *Id.*  It, too, therefore is appropriately withheld under the deliberative process privilege.  *See Am. Oversight*, 474 F. Supp. 3d at 272 (upholding Treasury's assertion of deliberative process privilege over records discussing strategic efforts to enact specific tax reform legislation).  Indeed, the very purpose of Exemption 5 is to encourage such "frank discussion of legal and policy issues."  S. Rep. No. 89-813 (1965).

The seventh and final Treasury document that CREW challenges as to Exemption 5 is Treasury9 (UST000845-870), an email attachment offering a detailed analysis and description of draft COVID-19 relief legislation.  Treasury released the majority of this document, *see* Dickerman Decl. ¶ 16, including portions that factually describe the contents of the draft legislation, but redacted limited portions in which leadership at the Office of Management and Budget ("OMB") offered opinions about the bill, including its shortcomings and proposed fixes.  *See* Treasury Vaughn Index at Treasury9.  For example, at UST_000846, Treasury withheld a block of text under the section header "Major Problems and Notable Surprises" in which OMB opined on what it viewed as shortcomings in the draft bill.  *Id.*  Similarly, at UST_000849, Treasury withheld a block of text under the header "Major problems that warrant pursuing a fix in the final bill," in which OMB offered its views on how to fix a flaw in the pending legislation.  Every other withholding in this document similarly concerns what OMB viewed as a problem in the pending legislation or its view on how to improve the legislation.  *See, e.g.*, UST_000850 (withholding text concerning "Significant unrequested funding" for EPA), -852 (withholding text concerning "Identified needs that the bill fails to address" and "Identified areas with limited/no connection to Corona response or stimulus" in Agriculture), -859 (redacting discussion of "Other notable surprises" in bill); *see generally* Treasury Vaughn Index at Treasury9.

Such internal Executive Branch discussion and analysis about how to improve pending legislation is, like Treasury7, a paradigmatic example of what Exemption 5 exists to shield.  *See Am. Oversight*, 474 F. Supp. 3d at 272.  Treasury9 reflects an OMB senior leader's views on a not yet enacted piece of legislation that both OMB and Treasury had a significant role in crafting and, ultimately, implementing.  *See* Treasury Vaughn Index at Treasury9.  The document therefore

"reflects the give-and-take of the consultative process" that both OMB and Treasury were engaged in with respect to the legislation at issue.  *Judicial Watch, Inc. v. FDA*, 449 F.3d at 151 (quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980)); *see also ICM Registry*, 538 F. Supp. 2d at 135 (documents reflecting personal opinions in ongoing agency deliberations about policy are "properly protected by the deliberative process privilege").  The withholdings from the document are therefore proper under Exemption 5.

**B.  USPS's withholdings are also predecisional and deliberative, and therefore also properly withheld under the deliberative process privilege.**

USPS's withholdings, like Treasury's, constitute core deliberative materials protected by Exemption 5.  CREW has indicated that it intends to challenge Exemption 5 claims in USPS's July 28, 2020 Board of Governors production; September 14, 2020 Postmaster General's Office Production, February 12, 2021 Postmaster General's Office Production, and the March 31, 2021 production of USPS OIG materials.  The Court should enter summary judgment affirming the withholdings in each of these productions.

*1.    July 28, 2020 Board of Governors production.*

The first documents that CREW challenges, USPS1 and USPS2 (USPS 0001-0006), are an April 2020 presentation from Ron Stroman, Deputy Postmaster General and Chief Government Relations Office, and Dave Williams, Chief Operating Office and Executive Vice President of USPS, to the Board of Governors concerning USPS's election mail strategic plan (USPS2), as well as its briefing sheet (USPS1).  *See* USPS Vaughn Index at USPS1-2.  The presentation, made after several primary elections in early 2020 and before upcoming primaries and the 2020 general election, reflects USPS's ongoing and evolving plan of action about how to handle election mail during the COVID-19 pandemic.  *Id.*  The presentation looks at lessons learned from earlier primaries and also charts forward-looking actions for USPS to take ahead of the general election. *Id.* This report therefore was part an of ongoing agency response the challenges of implementing voting-by-mail during various 2020 elections.  *Id.*  Such "briefings and reports . . . regarding the analysis" of an "ongoing policy" response are "properly withheld."  *CREW v. DHS*, 514 F. Supp.

14

2d 36, 46 (D.D.C. 2007); *see also ICM Registry*, 538 F. Supp. 2d at 134-135 (recognizing that documents prepared in the "ongoing process of examining agency policies" are deliberative and predecisional (citing *Sears*, 421 U.S. at 151 n.18)); *Hornbostel v. Dep't of Interior,* 305 F.Supp.2d 21, 31 (D.D.C.2003) (finding "emails exchanging thoughts and opinions about various legal and policy decisions" and briefings and reports exempt from FOIA disclosure as "part of the group thinking and preliminary actions encompassed by the policy making process in an agency"), *aff'd,* No. 03-5257, 2004 WL 1900562 (D.C. Cir. Aug. 25, 2004).

That conclusion is further bolstered here because the presentation specifically addresses questions raised by the Board of Governors concerning past lessons learned, how to implement those lessons nationally, and what processes were being put in place to resolve ballot issues. *See* USPS Vaughn Index at USPS1-2. That specific questions were posed by the Board of Governors reflects that agency implementation of its vote-by-mail policy was ongoing, evolving, and subject to review. *Id.* Such reports from subordinates to their superiors—here the supervising authority of the USPS—are particularly likely to be deliberative in nature. *See Access Reps.*, 926 F.2d at 1195 (observing that a "document from a junior to a senior is likely to reflect his or her own subjective opinions and will clearly have no binding effect on the recipient" (collecting cases making similar observations)); *Schlefer v. United States*, 702 F.2d 233, 238 (D.C. Cir. 1983) ("Intra-agency memoranda from 'subordinate' to 'superior' on an agency ladder are likely to be more 'deliberative' in character than documents emanating from superior to subordinate."). In sum, USPS1 and USPS2 are part of an ongoing conversation within the agency over vote-by-mail operations, and is therefore both predecisional and deliberative.

Appended to the presentation above is USPS3 (USPS 0007-0017), a document titled "General Election Outreach to States – Strategic Plan," which is properly withheld for essentially the same reasons. *See* USPS Vaughn Index at USPS3. That document reflects USPS's evolving and ongoing efforts to work with states to prepare for handling election mail and was part of the presentation made to the Board of Governors in USPS1 and USPS 2. *Id.*

CREW next challenges several related email threads—USPS4-9 (USPS0018-39)—from

April and May 2020 in which various USPS officials emailed back and forth over a draft press release announcing Louis DeJoy's selection as Postmaster General. *See* USPS Vaughn Index at USPS4-9. In these emails the officials discussed edits to a draft press release (which is attached to a May 6, 2020 email in draft form, reflecting track changes from various authors (USPS 0022-23)) and further discussed how to present DeJoy's selection to the public, including which aspects of his biography to stress, what professional experience qualified him for the role, and preparing for possible criticism of his selection by the Board of Governors. *Id.* These conversations were predecisional because they preceded DeJoy's actual announcement as Postmaster General and the release of any accompanying press materials, and were deliberative because they involved substantive back-and-forth about how the agency planned to announce his appointment. *See id.* As explained *supra*, internal deliberations and draft documents prepared in anticipation of press inquiries are protected under Exemption 5. *See Judicial Watch*, 736 F. Supp. 2d at 208; *see also Am. Ctr. for Law & Justice*, 334 F. Supp. 3d at 21; *Judicial Watch*, 2001 WL 1902811, at *3.[6]

The final email in this group, USPS9, attaches an update report from the executive search agency hired to assist the Board of Governors in identifying new Postmaster General candidates. *See* USPS Vaughn Index at USPS9 (USPS 0033-0039). The May 5, 2020 report, marked "Private and Confidential," provides a summary of the agency's search efforts to date and notes the selection of DeJoy as the next Postmaster General by the Board of Governors. *Id.*[7] Although the report notes the selection of DeJoy by the Board of Governors, it was nonetheless an "update"

---

[6] Several of these emails also include a separate email marked as a "non-responsive record." *See, e.g.*, USPS 0018, USPS 0019-20. That email concerned an earlier OIG investigation into a company that DeJoy had previously worked at, but not at the time of the OIG's investigation. *See* USPS Vaughn Index at USPS4-5. The email was therefore not responsive to CREW's requests to USPS. *Id.* USPS appropriately determined that this separate, non-responsive email was a distinct record from the email chains responsive to CREW's request. *Id.*.

[7] As a report prepared by a federal contractor, it satisfies the threshold test for Exemption 5, *i.e.*, that the information at issue be "inter or intra agency." 5 U.S.C. § 552(b)(5); *see McKinley v. Bd. of Governors of the Fed. Reserve Sys.*, 647 F.3d 331, 336 (D.C. Cir. 2011) (recognizing that "agency records containing comments solicited from nongovernmental parties" may constitute "intra-agency" records (citing *Nat'l Inst. of Military Justice v. U.S. Dep't of Def.*, 512 F.3d 677, 680, 682 (D.C. Cir. 2008)).

report concerning an ongoing search process that had not yet been completed—DeJoy's selection was not formally announced until May 6, 2021 and he did not take office until June 15, 2021.[8]  *See* USPS Vaughn Index at USPS9.  And the report further reflected *prior* search efforts undertaken before the Board of Governor's selection.  *Id.*  This information about the agency's search process is both predecisional and deliberative.  *See Mittleman v. King*, No. CIV. A. 93-1869 SSH, 1997 WL 911801, at *8 (D.D.C. Nov. 4, 1997) (finding materials related to an agency hiring decision to be deliberative).

### 2.    *September 14, 2020 Postmaster General's Office production.*

USPS's September 14, 2020 production includes numerous routine "Election Mail Media" reports and email summaries prepared by Janice D. Walker, USPS Vice President of Corporate Communications, compiled between June and July 2020.  *See* Castorina Decl. ¶ 34.  These reports and emails summarized media inquiries regarding USPS election policies, compiled public news stories about USPS's election mail efforts, and also served as a forum for USPS leadership to formulate responses to new media inquiries.  *Id.*  USPS released the majority of these reports to CREW, including the compilations of news stories covering USPS election mail efforts and the text of media inquiries to USPS.  *See generally* USPS 0257-458.[9]  USPS is continuing to withhold limited portions of these reports reflecting internal USPS deliberation about strategic response to open media inquiries.  *See* USPS Vaughn Index at USPS20, USPS22-31, USPS33; USPS35-36 (USPS 0257-271; USPS 0284-401; USPS 0405-415; USPS 0427-458).  These discussions about responding to pending media inquiries, as well as about formulating ongoing election mail media strategy generally, are properly withheld under Exemption 5.  *See Judicial Watch*, 736 F. Supp. 2d at 208; *see also Am. Ctr. for Law & Justice*, 334 F. Supp. 3d at 21; *Judicial Watch*, 2001 WL

---

[8] *See* USPS, Board of Governors Announces Selection of Louis DeJoy to Serve as Nation's 75th Postmaster General (May 6, 2020), https://about.usps.com/newsroom/national-releases/2020/0506-bog-announces-selection-of-louis-dejoy-to-serve-as-nations-75th-postmaster-general.htm.

[9] USPS released additional portions of these Election Mail Media reports, including the text of media inquiries to USPS, on May 1, 2021.  *See* Castorina Decl. ¶ 34.

1902811, at *3.

CREW has indicated it intends to challenge two other assertions of Exemption 5 within the September 14, 2020 production, namely two Executive Leadership Team weekly reports from June and July 2020 drafted by Sally Haring, Manager of Corporate Audit & Response at USPS. *See* USPS Vaughn Index at USPS21 (USPS 0272-283), USPS34 (USPS 0416-0426). These emails summarize and brief USPS leadership on OIG and GAO final reports, draft and discussion reports, white papers, and GAO reports, and further include attachments reflecting identical summaries to those contained within the emails themselves. *Id.* These emails are predecisional and deliberative because they are intended to brief USPS executive leadership about ongoing OIG and GAO investigations, audits, and reports to inform their decision-making about ongoing agency policies. *Id.* The emails further include summaries of the reports that reflect the author's impressions of the reports' key points and takeaways. *Id*; *see also Soghoian v. OMB*, 932 F. Supp. 2d 167, 180 (D.D.C. 2013) (affirming withholding of document reflecting employee's mental impressions of ongoing policy issues); *see also Techserve All. v. Napolitano,* 803 F. Supp. 2d 16, 26 (D.D.C. 2011) (finding that the deliberative process privilege protects "federal officials' notes, reports and other mental impressions"); *Hornbostel*, 305 F. Supp. 2d at 30 (similar).

Further still, the majority of the emails summarize non-final reports, typically labelled as "DISCUSSION DRAFT[s]," that had not yet been published or otherwise released to the public at the time Ms. Haring Executive Leadership Team reports. *See* USPS Vaughn Index at USPS21, USPS34. Those portions of the summaries are therefore further properly withheld under the deliberative process privilege, as they both reflect predecisional and deliberative opinions and impressions from the OIG and GAO, as well as the email author's impressions of those reports. *See, e.g.*, *Heffernan v. Azar*, 317 F. Supp. 3d 94, 128 (D.D.C. 2018) (finding deliberative process privilege protected "pre-final draft reports"); *Reliant Energy Power Generation, Inc. v. FERC*, 520 F. Supp. 2d 194, 204 (D.D.C. 2007) (concluding release of pre-final draft reports "would allow a reader to probe too deeply into the thought processes of the drafters and would have a chilling effect on communication between agency employees regarding similar projects and the future");

*Hamilton Sec. Grp. Inc. v. HUD*, 106 F. Supp. 2d 23, 32 (D.D.C. 2000) (concluding that a "draft audit report is protected from disclosure by Exemption 5 of the FOIA because it is both predecisional and deliberative, and disclosure of the draft audit report would threaten the integrity of the agency's policymaking processes"), *aff'd* No. 00-5331, 2001 WL 238162 (D.C. Cir. Feb. 23, 2001).

       3.      *February 12, 2021 Postmaster General's Office production.*

USPS's February 12, 2021 production contains additional Executive Leadership Team briefing reports on OIG and GAO activity from May 2020.  CREW has indicated it intends to challenge USPS's Exemption 5 withholdings from this production as to two specific categories of information: (1) a recurring, identical, comment about an OIG audit titled "Delivery Vehicle Acquisition"; and (2) a recurring, identical, comment about an OIG audit titled "Assessment of Overtime Activity."  *See* USPS Vaughn Index at USPS55, USPS59, USPS61-62, USPS65-66 (specifically at USPS 0506-507; USPS 0519; USPS 0544-545; USPS 0553-0554; USPS 0568; USPS 0577).  In both cases, the recurring comment concerned the author's opinion about draft OIG reports that had not yet been released to the public.  The first comment, concerning "Delivery Vehicle Acquisition," commented on public interest in the report in anticipation of the report's release.  *See id.* at USPS55, USPS59, USPS61-62, USPS65-66.  That report was not ultimately released until August 12, 2020, several months after the predecisional and deliberative comment CREW intends to challenge.  *See* USPS OIG, Auditor Report: Delivery Vehicle Acquisition Strategy [Report No. 19-002-R20] (Aug. 12, 2020), https://www. uspsoig.gov/sites/default/files/document-library-files/2020/19-002-R20.pdf.  The comment concerning "Assessment of Overtime Activity," similarly noted the sensitivity of the report ahead of its release.  That audit also was not released until August 2020.  *See* USPS OIG, Audit Report: Assessment of Overtime Activity [Report No. 20-209-R20] (Aug. 25, 2020), https://www.uspsoig.gov/sites/default/files/document-library-files/2020/20-209-R20.pdf.[10]  Both

---

[10] The Executive Leadership Team report notes that work on the "Delivery Vehicle Acquisition" audit began in August 2019, while work began on the "Assessment of Overtime Activity" audit

comments therefore reflect the author's forward-looking impressions of non-final draft reports about critical ongoing USPS policy audits.  *See* USPS Vaughn Index at USPS55, USPS59, USPS61-62, USPS65-66.  Such commentary on draft reports falls comfortably within Exemption 5.  *See CREW v. GSA*, No. CV 18-2071 (CKK), 2021 WL 1177797, at *10 (D.D.C. Mar. 29, 2021) (noting "courts in this jurisdiction have concluded that [] draft reports containing or eliciting comments are both deliberative and pre-decisional" (collecting cases)); *see also Soghoian*, 932 F. Supp. 2d at 180; *Techserve All.*, 803 F. Supp. 2d at 26.  These comments are also further examples of a subordinate employee offering their views to more senior officials, in this case the USPS Executive Leadership Team, which further indicates that the comments are deliberative.  *See Access Reps.*, 926 F.2d at 1195; *Schlefer*, 702 F.2d at 238.

USPS's February 21, 2021 production included a May 18, 2020 email titled "OIG-GAO Slide Deck in lieu of ELT Meeting."  *See* USPS Vaughn Index at USPS60 (USPS 0521-536).  The email attaches a May 18, 2020 slide deck titled "OIG – GAO Review."  *Id.*  CREW has indicated it intends to challenge Exemption 5 withholdings within this presentation.  The first such withholding, on pages 5 and 6 of the report (*see* USPS 0526-527), concerns internal procedural information about the GAO's timeline for completing studies.  *See* USPS Vaughn Index at USPS60.  Such "information about the timing of the deliberative process is properly protected under the deliberative process privilege."  *Judicial Watch, Inc. v. Dep't of Treasury*, 796 F. Supp. 2d 13, 30 (D.D.C. 2011) (citing *Wolfe*, 839 F.2d at 774); *see also Wolfe*, 893 F.2d at 775 (affirming withholding of information that "would reveal the timing of the deliberative process").

The next redactions within this report are bullet point notes on pages 10 and 11 (*see* USPS 0531-532) in the "OIG Audit" section discussing "Delivery Vehicle Acquisition Strategy."  These pages discuss preliminary findings of the OIG's draft report on this topic and further note USPS leadership's responses and thoughts on those findings.  *See* USPS Vaughn Index at USPS60.

---

began in March 2020.  *See, e.g.*, USPS Vaughn Index at USPS55, USPS59, USPS61-62, USPS65-66.  But as explained, the reports were not finalized and released to the public until August 2020 and remained in draft format until that time.

These bullets further include a proposed recommendation from OIG to USPS, as well as commentary on how the report is likely to be perceived by the public. *Id.* These internal notes discussing and responding to a draft audit report are predecisional and deliberative for substantially the same reasons as the comment above. *See CREW*, 2021 WL 1177797, at *10; *Soghoian*, 932 F. Supp. 2d at 180; *Techserve All.*, 803 F. Supp. 2d at 26.

The final redactions in the report are on pages 12 to 15 (*see* USPS 0533-536) and concern USPS's internal analysis of OIG audit statistics, including the status of open and closed audits and open recommendations from OIG to USPS. *See* USPS Vaughn Index at USPS60. In other words, the slides reflect USPS's own internal assessment and deliberations over its ongoing implementation and response to outstanding OIG audit recommendations. *Id.* This internal analysis of OIG's auditing process is predecisional and deliberative because it discloses USPS's own process for implementing and reviewing open OIG recommendations. *Cf. Cause of Action Inst. v. Exp.-Imp. Bank of the United States*, No. CV 19-1915 (JEB), 2021 WL 706612, at *7 (D.D.C. Feb. 23, 2021) (recognizing that disclosing "internal analysis" may reveal sensitive aspects of agency's internal decision-making process). And it is further protected by the deliberative process privilege because it reveals the status of USPS's own implementation of open recommendations. *See Odland*, 34 F. Supp. 3d at 20 (noting that the "[D.C.] Circuit has held that an internal discussion regarding the implementation of a policy is exempt from disclosure under Exemption 5" (citing *Mead Data Cent., Inc. v. Dep't of Air Force*, 566 F.2d 242, 256 (D.C. Cir. 1977)); *see also Hornbostel*, 305 F. Supp. 2d at 31 (finding status reports on policy implementation predecisional and deliberative); *S. All. for Clean Energy v. Dep't of Energy*, 853 F. Supp. 2d 60, 77 (D.D.C. 2012) (similar).

4.      *March 31, 2021 OIG production.*

CREW further indicated that it intends to challenge USPS's withholding five documents from its March 31, 2021 production, to the extent USPS solely relies upon Exemption 5 for such

withholdings.[11]   These documents are properly withheld under Exemption 5, and substantial portions of them are further properly withheld under Exemption 3.

The first document at issue in this production is USPS72 (USPS 0688-736), which is a 49-page August 10, 2020 Executive Leadership Team presentation outlining tactical initiatives for USPS's operating plan, including goals and objectives for ongoing and future business and policy initiatives.  *See* USPS Vaughn Index at USPS72.  This document was prepared for an Executive Leadership Team meeting to discuss USPS's high-level strategy going forward.  Such forward-looking strategy documents, particularly those presented to an agency's executive leadership, are both predecisional and deliberative.  *See, e.g.*, *Cause of Action Inst.*, 2021 WL 706612, at *11 (approving of agency withholding "strategic plan" documents in full); *Life Extension Found., Inc. v. IRS*, 915 F. Supp. 2d 174, 182 (D.D.C. 2013) (approving withholding 52 pages of material containing strategy and analysis under deliberative process privilege), *aff'd,* 559 F. App'x 3 (D.C. Cir. 2014); *cf. Soghoian*, 932 F. Supp. 2d at 183 (approving withholding of emails discussing a joint strategic plan).

The next four documents—USPS73-76 (USPS 0737-753; USPS 0754-775; USPS 0776-799; USPS 0800-856)—are internal presentations from the USPS's Chief Operating Officer providing training and guidance to USPS field employees on various issues, including but not limited to processing election mail.  *See* USPS Vaughn Index at USPS73-76.  The first is a July 30, 2020 presentation entitled "Ballots Cancellation – Every Piece Postmarked."  *See* USPS Vaughn Index at USPS73.  This document exclusively concerns the processing of election mail and reflects USPS's ongoing efforts to internalize lessons learned from earlier primary elections in preparation for the 2020 general election.  *Id.*  The presentation also identifies objectives and

---

[11] Several portions of these documents were also initially withheld under Exemption 3 and the Postal Reorganization Act ("PRA") (39 U.S.C. § 410), but CREW does not challenge those assertions here.  USPS therefore does not address the portions of these records that the parties agree are properly withheld under Exemption 3.  However, because USPS now believes that additional portions of three of these documents are properly withheld under Exemption 3 and the PRA, it briefly addresses those portions of the documents *infra*.

proposed methods for processing election mail as part of USPS's then-ongoing efforts to prepare for the upcoming general election. *Id.* Documents reflecting an agency's thoughts, impressions, and strategic planning in response to an ongoing policy issue are properly withheld under Exemption 5. *See, e.g.*, *Soghoian*, 932 F. Supp. 2d at 180 (agency appropriately withheld records reflecting its mental impressions regarding an ongoing policy issue); *ICM Registry*, 538 F. Supp. 2d at 134 (similar); *CREW*, 514 F. Supp. 2d at 46 (records relating to ongoing response to a policy issue and including suggested solutions properly withheld under Exemption 5).

The final three documents at issue are a July 31, 2020 presentation titled "COO Learn and Grow Field Webinar," a June 19, 2020 presentation titled "COO Learn and Grow Field Webinar," and a July 9, 2020 presentation titled "COO Town Hall Meeting" presentation. *See* USPS Vaughn Index at USPS74-76. USPS initially withheld these documents in full under Exemption 5, with specific portions withheld under Exemption 3 and the PRA. In re-reviewing these documents in anticipation of this motion, USPS counsel determined that (1) portions of these three documents could be released; (2) additional portions of the documents should be further withheld under Exemption 3 and the PRA; and (5) the remaining portions remain properly withheld under Exemption 5 alone. *See* Castorina Decl. ¶¶ 25-27. The corrected redactions to these documents are included in this filing. *See* USPS 0754-856.

The additional withholdings under Exemption 3 and the PRA are appropriate because the slides at issue reflect information about strategic business operations, data about work hours performed by USPS employees, and other data and statistics about staffing and mail volumes. *See* USPS Vaughn Index at USPS74-76; Castorina Decl. ¶¶ 25-27. The PRA, in conjunction with Exemption 3, permits USPS to withhold "information of a commercial nature . . . which under good business practice would not be publicly disclosed." *DBW Partners, LLC v. USPS*, No. CV 18-3127 (RC), 2019 WL 5549623, at *7 (D.D.C. Oct. 28, 2019) (quoting 39 U.S.C. § 410.).[12]

---

[12] Exemption 3, in turn, permits agencies to withhold records "specifically exempted from disclosure by statute . . . if that statute . . . establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3). Courts, including those within this District, have uniformly concluded that the PRA is such a statute. *See, e.g.*, *Braun v. USPS*,

Case 1:20-cv-02256-CKK   Document 23   Filed 06/10/21   Page 37 of 56

These additional slides, for substantially the same reasons as the slides that CREW does not challenge, contain such "information of a commercial nature," as they include sensitive information and data regarding the mechanics of USPS delivery operations. *See* Castorina Decl. ¶¶ 25-27. These records would not be publicly disclosed under good business practices because they would offer a competitive advantage to USPS's chief competitors, such as FedEx and USPS, that likewise would never release such sensitive business operation information. *Id.*

The remaining portions of the three documents that are withheld solely under Exemption 5 are also properly withheld. Portions of these documents contain similar guidance, lessons learned, and preparatory instructions for election mail processing as the document above. As documents reflecting USPS's response and strategic thinking about an ongoing policy issue, these portions of those documents are properly withheld for the substantially the same reasons. *See* USPS Vaughn Index at USPS74-76; *see also* supra at 22-23. The remaining portions of these records withheld exclusively under Exemption 5 are slides discussing internal strategic conversations about open USPS business and policy initiatives related to staffing, training, bidding on commercial vehicles, purchasing, and other not-yet-implemented programs designed to improve operational efficiency. *See* USPS Vaughn Index at USPS74-76; Castorina Decl. ¶ 37. In each instance the slides concern USPS initiatives still in the strategic planning, design, and implementation phase. *See* USPS Vaughn Index at USPS74-76. As such, they disclose non-final agency thinking about non-final programs. They are therefore predecisional and deliberative, and thus properly withheld under Exemption 5. *See, e.g.*, *ICM Registry*, 538 F. Supp. 2d at 134; *CREW*, 514 F. Supp. 2d at 46.

## II.    Defendants Properly Withheld Records under FOIA Exemption 6

Exemption 6 provides that FOIA does not extend to "personnel and medical files and

---

317 F. Supp. 3d 540, 549 (D.D.C. 2018); *Am. Postal Workers Union, AFL-CIO v. USPS*, 742 F. Supp. 2d 76, 81 (D.D.C. 2010); *Airline Pilots Ass'n, Int'l v. USPS*, No. CIV.A. 03-2384 (ESH), 2004 WL 5050900, at *5 (D.D.C. June 24, 2004); *Piper & Marbury, LLP v. USPS*, No. CIV.A. 99-2383JMFCKK, 2001 WL 214217, at *3 (D.D.C. Mar. 6, 2001).

similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6).  Courts in this circuit "generally follow a two-step process when considering withholdings or redactions under Exemption 6." *Am. Immigr. Lawyers Ass'n v. Exec. Off. for Immigr. Rev.*, 830 F.3d 667, 673 (D.C. Cir. 2016).  First, they "determine whether the records are personnel, medical, or 'similar' files covered by Exemption 6." *Id.* (quoting *Multi Ag Media LLC v. Dep't of Agric.*, 515 F.3d 1224, 1228 (D.C. Cir. 2008) (brackets omitted)).  The term "similar files" in Exemption 6 is read broadly to cover records concerning "an individual which can be identified as applying to that individual." *Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 602 (1982) (quoting H.R. Rep. No. 89-1497 at 11 (1966)).

After determining records qualify as personnel files, courts next "determine whether their disclosure 'would constitute a clearly unwarranted invasion of personal privacy.'" *Am. Immigr. Lawyers Ass'n*, 830 F.3d at 673 (quoting 5 U.S.C. § 552(b)(6)).  To determine whether the invasion of privacy is "warranted," courts again follow "another two-step process" that first requires determining whether "disclosure would compromise a substantial, as opposed to a *de minimis*, privacy interest." *Id.* at 673-674 (citing *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 33 (D.C. Cir. 2002)).  Second, if the privacy interest is substantial, courts weigh that interest "against the public interest in the release of the records." *Id.* at 674.

## A.  Treasury properly withheld Secretary Mnuchin's personal email address and Treasury alias email address under FOIA Exemption 6.

CREW challenges Treasury's withholding of: (1) roughly two dozen instances where Treasury withheld the user name portion of Secretary Mnuchin's non-public facing alias Treasury email address in order to maintain the privacy of Secretary Yellen's current alias email address, *see* Treasury Vaughn Index at Treasury10 (various Bates ranges); and (2) a single document, Treasury1 (UST_000186), which includes Secretary Mnuchin's personal email address in the "from" line forwarding something to his Treasury alias email address, *see* Treasury Vaughn Index

at Treasury 1.[13]  CREW challenges the later withholding to the extent Treasury has refused to release the domain name portion of the email address, but Treasury's decision to withhold both the user name and domain portions of the address (either in tandem or alone) is proper.

Treasury's longstanding practice, over multiple administrations, has been to supply the Secretary with a non-public business email account, referred to as an "alias" account.  *See* Law Decl. ¶ 3.  Secretaries use these alias accounts to supervise agency activity and communicate with Treasury colleagues and others within the federal government.  *Id.* ¶ 5.  Unlike public-facing accounts, which are typically monitored by the Secretary's staff, these alias accounts are used directly by the Secretary.  *Id.* ¶¶ 5, 8.  Treasury therefore takes significant measures to ensure the privacy of these alias email addresses in order to maintain privacy, provide security, and avoid the sort of harassment and spam that would occur if the email address was made public.  *Id.* ¶¶ 6-9. To that end, both former Secretary Mnuchin and now Secretary Yellen were provided with alias email accounts to facilitate internal correspondence at Treasury and correspondence with other trusted federal government counterparts.  *Id.* ¶¶ 4-5.  These accounts, along with several prior accounts and potential future accounts, are created in a common manner to derive a customized user name.  *Id.* ¶ 11.  Accordingly, releasing one such alias account, such as Secretary Mnuchin's, would effectively reveal other alias accounts, including Secretary Yellen's.  *Id.*  Permitting these alias accounts, or the manner for creating them, to be made public would cause significant harm to the Secretary's ability to lead the agency, potentially inviting digital attacks and phishing scheme efforts as well as inundating the Secretary's personal work email account with harassing or irrelevant emails.  *Id.* ¶¶ 6-8, 11.[14]  The agency's decision to withhold the Secretary's email

---

[13] The records released by Treasury to CREW contained three email address for Secretary Mnuchin: (1) his personal non-Treasury email address; (2) his public-facing Treasury email address; and (3) his non-public-facing "alias" email address.  *See* Dickerman Decl. ¶¶ 16-18 Treasury disclosed Secretary Mnuchin's public-facing Treasury email address in full, but withheld his personal email address in full along with the user name portion of his alias address.  *Id.*

[14] For example, in December 2020, the Secretary's public-facing email address (which Treasury has released) received 2,317 emails from outside of the Treasury, only 52 of which were relevant and required follow-up by Treasury staff.  *See* Law Decl. ¶ 8.  Permitting release of the Secretary's

address here was therefore proper under Exemption 6.

*First*, Secretary Mnuchin's email address qualifies as a personnel file, as "courts in this District have held that Exemption 6 applies to email addresses." *Hall & Assocs. v. EPA*, No. CV 19-1095 (RC), 2020 WL 4673411, at *3 (D.D.C. Aug. 12, 2020) (collecting cases); *see also Baldwin v. Dep't of Energy*, No. CV 18-1872 (EGS), 2020 WL 376563, at *4 (D.D.C. Jan. 23, 2020) (collecting additional cases). The email address at issue, created in a manner Treasury uses to make alias accounts for Secretaries, is specific to former Secretary Mnuchin but if released would also likely reveal Secretary Yellen's current email address. *See* Law Decl. ¶¶ 4, 11. It is therefore the sort of "personal identifying information" that "fall[s] within the scope of exemption 6." *Prison Legal News v. Samuels*, 787 F.3d 1142, 1148 n.6 (D.C. Cir. 2015) (explaining the exemption applies to identifying information such as names and addresses); *see also Gov't Accountability Project v. Dep't of State*, 699 F. Supp. 2d 97, 106 (D.D.C. 2010) (explaining that "email addresses can be identified as applying to particular individuals" are thus are "similar files" for purposes of Exemption 6).

*Second*, the privacy interest held by Secretary Yellen in withholding Secretary Mnuchin's email address is substantial and significantly outweighs any public interest in disclosure. Secretary Yellen, as well as her predecessor, relies upon these alias email accounts for conducting duties as Treasury Secretary. *See* Law Decl. ¶ 5. Moreover, unlike public-facing accounts, Secretary Yellen personally oversees and control, meaning that messages sent to her alias email address go directly to her, rather than aides or staff. *Id.* In such circumstances, courts have "upheld the withholding of email addresses used for work purposes where they are not publicly available." *Hall & Assocs.*, 2020 WL 4673411, at *5 (collecting cases); *see also Ctr. for Pub. Integrity v. Dep't of Def.*, 486 F. Supp. 3d 317, 325-326 (D.D.C. 2020) (explaining that releasing "email addresses of agency workers . . . would clearly constituted an unwarranted invasion of privacy"); *Day v. Dep't of State*, No. CV 17-1418 (EGS), 2020 WL 1078955, at *8 (D.D.C. Mar. 6, 2020) (finding withholding of

---

alias account would invite similar harassment and spam emails to the account that the Secretary uses to conduct official Treasury business. *Id.*

federal employee emails appropriate under Exemption 6); *also Conservation Force v. Jewell*, 66 F. Supp. 3d 46, 67 (D.D.C. 2014) (same), *aff'd*, No. 15-5131, 2015 WL 9309920 (D.C. Cir. Dec. 4, 2015); *Pinson v. Lappin*, 806 F. Supp. 2d 230, 234 (D.D.C. 2011) (same); *Gov't Accountability Project*, 699 F. Supp. 2d at 106 (same).[15]

On the other side of the scale, CREW can point to no legitimate public interest in disclosure of the user name portion of Secretary Mnuchin's alias account.  "The only relevant 'public interest in disclosure' to be weighed in this balance is the extent to which disclosure would serve the 'core purpose of the FOIA,' which is 'contributing significantly to public understanding of the operations or activities of the government.'" *Am. Immigr. Lawyers Ass'n*, 830 F.3d at 674 (quoting *Dep't of Def. v. FLRA*, 510 U.S. 487, 495 (1994)).  Releasing the user name portion of former Secretary Mnuchin's alias email account does nothing to further public understanding of the operations or activities of Treasury or federal government broadly.  That is particularly true here, as Treasury has labelled every instance where it redacted the user name with Secretary Mnuchin's name to clearly indicate which redacted email addresses are his.  *See* Law Decl. ¶ 12.  The total lack of an interest in disclosure of the user name is determinative, as "even a modest privacy interest[] outweighs nothing every time." *See Consumers' Checkbook Ctr. for the Study of Servs. v. HHS*, 554 F.3d 1046, 1056 (D.C. Cir. 2009) ("We have been shown no public interest in . . . disclosure. . . . We need not linger over the balance; something, even a modest privacy interest, outweighs nothing every time." (quoting *Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d 873, 879 (D.C. Cir. 1989))).  But even if CREW could identify a legitimate public interest, it would nonetheless be substantially outweighed by the interest in maintaining the anonymity of Secretary Yellen's current alias email accounts.  *See* Law Decl. ¶¶ 4-11.

---

[15] While all federal employees have a privacy interest in preventing disclosure of their individualized, non-public email addresses, Secretary Mnuchin's status as a cabinet member further shows a substantial privacy interest.  Such highly-visible member government officials are particularly susceptible to unwarranted harassment and attention.  *See, e.g.*, Law Decl. ¶ 8.  For that reason, courts approve of withholding the government email addresses of such high-ranking individuals.  *See, e.g.*, *Shurtleff v. EPA*, 991 F. Supp. 2d 1, 18-19 (D.D.C. 2013) (EPA appropriately withheld government email address of EPA Administrator).

Treasury's withholding of former Secretary Mnuchin's full personal email in address in Treasury1 was also proper.  *See, e.g.*, *Competitive Enter. Inst.*, 12 F. Supp. 3d at 123 (recognizing the "powerful privacy interest" government officials have their "own personal email address"); *Freedom Watch, Inc. v. NSA*, 49 F. Supp. 3d 1, 9 (D.D.C. 2014) (finding "purely personal information" such as "personal email addresses" "clearly falls within Exemption 6"); *Shurtleff*, 991 F.Supp.2d at 18 (finding that defendants withholding of, *inter alia*, personal email addresses is proper under Exemption 6).

CREW indicated that it would drop its challenge to this withholding if Treasury released the domain portion of the email address, but former Secretary Mnuchin has a substantial privacy interest in avoiding public disclosure of both the full address and the domain name alone.  Courts have recognized that individuals have a privacy interest in the domain portion of their email addresses.  *See, e.g.*, *Trotter v. Ctr. for Medicare & Medicaid Servs.*, No. 1:19-CV-2008-RCL, 2021 WL 430912, at *3 (D.D.C. Feb. 8, 2021) (recognizing domain names "convey information about the person to which they belong"); *Prechtel v. FEC*, 330 F. Supp. 3d 320, 333 & n.5 (D.D.C. 2018) (recognizing such information "can reveal important information about the identity" of the email holder).  That is particularly true here, where the domain portion of Secretary Mnuchin's is not a common commercial email service (such as Gmail or Yahoo), but rather a private domain.  *See* Dickerman Decl. ¶ 18.  Releasing the domain portion of his personal email address therefore provides critical information about his full address.  *Id.*.

Moreover, CREW cannot show any possible public interest in disclosure of Secretary Mnuchin's personal email address, including release of the domain name alone.  Courts have found that "there is no public interest in knowing" whether a government employee used common domains such as "Hotmail or Yahoo for their personal email correspondence."  *Competitive Enter. Inst.*, 12 F. Supp. 3d at 122; *see also Trotter*, 2021 WL 430912, at *6 (concluding Plaintiff "identified no public interest in disclosing" domain names and thus balance of interests weighed against disclosure).  Because knowing which email platform Secretary Mnuchin uses for his personal email correspondence offers no insight into the operation or activities of government, his

privacy interest in the domain necessarily outweighs the public interest in disclosure.  *See Consumers' Checkbook Ctr.*, 554 F.3d at 1056.[16]

### B.   USPS properly withheld limited amounts of employee personal identifying information under FOIA Exemption 6.

USPS withheld the individualized work email addresses and work cell phone numbers of USPS staff identified in its productions, but did not redact the names of these individuals in email "to," "from," and "cc" lines.  *See, e.g.*, USPS Vaughn Index at USPS8,-20, -23, -76;[17] *see also* Castorina Decl. ¶¶ 39-43.  These pieces of personal identifying information are properly withheld for substantially the same reasons as Secretary Mnuchin's email address.  *First*, records revealing work email addresses and work cell phone numbers qualify as personnel records under Exemption 6.  *See, e.g.*, *Judicial Watch, Inc. v. Dep't of State*, 875 F. Supp. 2d 37, 47 (D.D.C. 2012) (emails containing, *inter alia*, phone numbers "qualify as similar files because they contain personal information about the named government personnel"); *see also Prison Legal News*, 787 F.3d at 1148 n.6.  And courts routinely find that government personnel have a significant privacy interest in such information.  *See Smith v. Dep't of Treasury*, No. 17-CV-1796 (TSC), 2020 WL 376641, at *4 (D.D.C. Jan. 23, 2020) ("Disclosing the numbers for work cell phones, which employees maintain in their homes and on their person, could subject them to the type of harassment exemption 6 was designed to prevent, and therefore the court finds that the Treasury employees maintain a privacy interest in protecting their work cell phone numbers."); *see also Competitive Enter. Inst.*, 12 F. Supp. 3d at 123; *Freedom Watch, Inc.*, 49 F. Supp. 3d at 9.

This privacy interest substantially outweighs any interest in disclosure.  Postal employees have a substantial interest in avoiding harassment, spam calls and emails, and attempted hacking

---

[16] Treasury has also withheld the email address of OMB Director Russell T. Vought in a single document.  *See* Treasury Vaughn Index at Treasury8.  This email address is properly withheld for substantially the same reasons provided in Section II.B for withholding the email addresses of USPS employees.

[17] Treasury redacted these work email addresses and work cell phone numbers through its production of documents to CREW, and accordingly cites these Vaughn Index entries as examples.  The rationale for withholding this information is substantially the same for each record at issue.

attempts that could result from release of their work email addresses and cell phone numbers. USPS email accounts often receive a substantial amount of spam email, some of which is malicious and could lead to hacking attempts. *See* Castorina Decl. ¶¶ 39-43. Prior successful hacking attempts on USPS data systems are believed to have originated in malicious phishing efforts targeted at employee email addresses. *Id*; *see also* CNN, *Massive Postal Service Breach Hits Employees and Customers* (Nov. 10, 2014), https://www.cnn.com/2014/11/10/politics/postal-service-security-breach/index.html; NPR, *More Than 800,000 Postal Service Employees Victims of Data Breach* (Nov. 10, 2014), https://www.npr.org/sections/thetwo-way/2014/11/10/363074340. Similarly, hackers sometimes present themselves as using USPS email addresses in attempting to hack ordinary citizens. *See* TechRepublic, *New Phishing Email Campaign Impersonates US Postal Service to Deliver Malware* (Nov. 14, 2019), https://www.techrepublic.com/article/new-phishing-email-campaign-impersonates-us-postal-service-to-deliver-malware/. Accordingly, in addition to their interest in avoiding personal harassment and spam emails or calls to their work accounts, USPS employees have a further interest in avoiding the use of their personal work accounts in such hacking efforts. *See* Castorina Decl. ¶¶ 39-43.

On the other side of the ledger, CREW can point to no significant public interest in disclosure, as releasing USPS employee email addresses and cell phone numbers does nothing to further the public's understanding of USPS's operation. *See Am. Immigr. Lawyers Ass'n*, 830 F.3d at 674. A court within this district has previously concluded that releasing the precise information here—USPS employee email addresses and phone numbers—did not further the public's understanding of the agency's activities. *See Braun v. USPS*, 317 F. Supp. 3d 540, 550 (D.D.C. 2018) (noting "USPS redacted the . . . phone numbers . . . and email addresses of USPS employees" due to harassment concerns and concluding "the Court does not see how disclosure of this information could 'she[d] light on an agency's performance of its statutory duties or otherwise let citizens know what their government is up to" (quoting *Lepelletier v. FDIC*, 164 F.3d 37, 46 (D.C. Cir. 1999)); *see also Hall & Assocs.*, 2020 WL 4673411, at *6 (noting the "virtually nonexistent

public interest in disclosure" of information such as work email addresses); *Smith*, 2020 WL 376641, at *5 (concluding similar "requested information does little to inform the public about how Treasury operates"). The court therefore upheld the agency's assertion of Exemption 6 in view of its credible representation about the privacy interest at stake for USPS employees. *See Braun*, 317 F. Supp. 3d at 550 (concluding that "USPS has properly invoked FOIA Exemption[] 6"). The same result is appropriate here. *See, e.g.*, USPS Vaughn Index at USPS8,-20, -23, -76; Castorina Decl. ¶¶ 39-43.

## III.    Defendants Properly Withheld Records under FOIA Exemption 7

Exemption 7 protects against disclosure of certain categories of "information compiled for law enforcement purposes." 5 U.S.C. § 552(b)(7). Two such categories apply to both Treasury and USPS materials: "information compiled for law enforcement purposes" that "(C) could reasonably be expected to constitute an unwarranted invasion of personal privacy;" and "(E) would disclose techniques and procedures for law enforcement investigations or prosecutions." *Id.* § 552(b)(7)(C), (E). Further, the release of certain such Treasury information "(F) could reasonably be expected to endanger the life or physical safety of any individual." *Id.* § 552(b)(7)(F). To fall within Exemption 7, records must first meet the predicate requirement of being "compiled for law enforcement purposes." *Id.* § 552(b)(7). That term is broadly construed and "refers to the act of enforcing the law, both civil and criminal." *Pub. Emps. For Env't Resp. ("PEER") v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mexico*, 740 F.3d 195, 203 (D.C. Cir. 2014); *see also Jefferson v. DOJ*, 284 F.3d 172, 178 (D.C. Cir. 2002) (similar).

### A.    Treasury properly withheld Secretary Mnuchin's alias email account under Exemptions 7(C), (E), and (F).

Treasury properly withheld former Secretary Mnuchin's alias email address user name because release of that information poses a threat of unwarranted personal invasion of Secretary Yellen's privacy, reveals law enforcement techniques, and, if released, could reasonably endanger the safety of Secretary Yellen and those around her. *See* Treasury Vaughn Index at Treasury 1, Treasury 10; Law Decl. ¶¶ 4-11; Dickerman Decl. ¶ 17.

As an initial matter, Secretary Mnuchin's alias email account, and documents and emails disclosing that account user name, are records compiled for law enforcement purposes because the Secretary of the Treasury's duties include numerous law enforcement responsibilities, both civil and criminal, including strengthening national security, protecting the integrity of the financial system, and enforcing Federal finance and tax laws. *See generally* Treasury, *Role of the Treasury*, https://home.treasury.gov/about/general-information/role-of-the-treasury (last visited June 9, 2021). As explained, the Secretary's personal alias email account is instrumental to his or her ability to supervise these efforts, lead the agency, and communicate with others both within Treasury and the rest of the federal government. *See* Law Decl. ¶ 5. Moreover, the alias account is created by Treasury personnel in a manner designed to maintain the account's anonymity and avoid public disclosure. *See* Law Decl. ¶¶ 3-4, 11.

Law enforcement activities are not limited solely to responding to prior violations of the law, but also include "proactive steps designed to prevent criminal activity and to maintain security." *Milner v. Dep't of Navy*, 562 U.S. 562, 582-583 (2011) (Alito, J., concurring) (further explaining that "security measures are critical to effective law enforcement as we know it" and accordingly there is "no doubt, for example, that the Secret Service acts with a law enforcement purpose when it protects federal officials from attack, even though no investigation may be ongoing"); *see also PEER*, 740 F.3d at 203 (same). Treasury's creation of Secretary Mnuchin's alias email account was such a proactive step both (1) to ensure the security of the Secretary's email account and the sensitive information contained therein, including information about the Secretary's schedule, movements, and security detail, and also (2) to permit the Secretary to effectively executive his law enforcement duties as leader of the Treasury Department. *See* Law Decl. ¶¶ 5, 11.

As a record compiled for law enforcement purposes, Secretary Mnuchin's email address user name qualifies for withholding under three Exemption 7 categories. *First*, releasing the information would effectively reveal the manner in which Treasury creates each Secretary's individualized alias account. *See* Law Decl. ¶ 11. Releasing former Secretary Mnuchin's alias

email address would in effect permit the public, including potential malicious actors, to discern Secretary Yellen's current alias account. *Id.*.  Exemption 7(C) precludes such *de facto* release of Secretary Yellen's current alias account, as courts have "repeatedly [] endorsed the application of Exemption 7(C) 'to withhold names, addresses, telephone numbers, . . . and other such private information regarding law enforcement officials, . . . [and] other government employees." *Cooper v. DOJ*, 169 F. Supp. 3d 20, 36 (D.D.C. 2016) (quoting *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1115 (D.C. Cir. 2007)).  CREW cannot plausibly identify any countervailing public interest in disclosure outweighing this privacy interest. *See id.* at 37 (recognizing the only countervailing interest in disclosure sufficient to overcome privacy interest in such information is evidence that its disclosure is necessary "to confirm or refute compelling evidence that the agency is engaged in illegal activity").

*Second*, release of former Secretary Mnuchin's alias email address user name would effectively reveal the manner and procedures Treasury uses to create and protect such accounts. *See* Law Decl. ¶ 11.  This description of the technique at issue, the reasonable probability that disclosure would reveal the technique, and the consequences of such disclosures passes the "low bar for the agency to justify withholding" under Exemption 7(E). *Blackwell v. FBI,* 646 F.3d 37, 42 (D.C. Cir. 2011) (explaining that Exemption 7(E) "sets a relatively low bar for the agency to justify withholding" and "only requires that the [agency] demonstrate logically how the release of the requested information might create a risk" of revealing the technique at issue (quoting *Mayer Brown LLP v. IRS,* 562 F.3d 1190, 1193 (D.C. Cir. 2009)).

*Third*, because disclosure of Secretary Mnuchin's alias email account user name materially increases the probability that Secretary Yellen's alias email account could be hacked or improperly accessed, it could reasonably be expected that disclosure would endanger Secretary Yellen's safety, as well as those in her proximity. *See* Law Decl. ¶ 11.  The Secretary's email account includes sensitive information about her schedule, movements, and security detail that, if released, could pose a risk to her security and would undermine the integrity of protocols for ensuring her safety. *Id*.  That reasonable probability suffices for withholding under Exemption 7(F), which

does not require that disclosure "*definitely* endanger life or physical safety; a reasonable expectation of endangerment suffices." *PEER*, 740 F.3d at 205 (emphasis in original). Here, Treasury has credibly shown that disclosure of former Secretary Mnuchin's email address would likely disclose current Secretary Yellen's email address and subject it to greater risk of improper access, potentially revealing sensitive information regarding the Secretary's security. "Its reliance on Exemption 7(F) is therefore proper." *Friedman v. United States Secret Serv.*, 282 F. Supp. 3d 291, 307 (D.D.C. 2017) (upholding assertion of Exemption 7(F) where agency "satisfied that requirement by demonstrating that disclosure of the security-related information at issue could endanger the safety" of an individual).

**B.    USPS properly withheld United States Postal Inspector Service materials under Exemption 7(C) and (E).**

CREW has indicated it intends to challenge USPS's redactions under Exemption 7 to portions of two documents in its September 14, 2020 Postmaster General's Office Production associated with USPS36. The first document, located within USPS36 at USPS 0454-456, is a June 30, 2020 USPIS summary report on the observation of mail conditions at several postal facilities in Colorado, Oklahoma, and Utah. USPS redacted the names of several USPS leaders at these facilities who spoke with USPIS Inspectors about election mail conditions, including a Manager of Distribution Operations at a Denver facility; a Supervisor of Distribution Operations at a Grand Junction, CO facility; a Senior Plant Manager at an Oklahoma City facility; a Plant Manager at a Tulsa facility; a Manager of Distribution Operations at a Salt Lake City facility; and a Postmaster, Acting Supervisor, and Plant Manager at a Provo facility. *Id.* USPIS's inspection of these facilities was to ensure compliance with USPS delivery rules and to support the security of election and political mail moving through the USPS network. *See* Castorina Decl. ¶¶ 45-49; *see also* USPS 0454-456.

The identities of these individuals were properly withheld under Exemption 7(C). Courts routinely approve withholding the names of third parties who provide information to law enforcement personnel under Exemption 7(C). *See, e.g., Schrecker v. DOJ*, 349 F.3d 657, 666

(D.C. Cir. 2003) (recognizing that "persons involved in law enforcement investigations – witnesses, informants, and the investigating agents – have a substantial interest in seeing that their participation remains secret." (internal quotation omitted)); *Fitzgibbon v. CIA,* 911 F.2d 755, 767 (D.C. Cir. 1990) ("It is surely beyond dispute that the mention of an individual's name in a law enforcement file will engender comment and speculation and carries a stigmatizing connotation." (internal quotation marks and citation omitted)).   At least one court has previously found specifically that "USPIS's decision to withhold such third party information under Exemption 7(C) is entirely appropriate." *Banks v. DOJ*, 813 F. Supp. 2d 132, 143-144 (D.D.C. 2011) (approving of agency's decision to withhold the names of agents and names and personal information of third parties who provided information to agents); *see also Sussman*, 494 F.3d at 1115 (affirming withholding information identifying "third-party individuals" associated with a law enforcement investigation).   CREW has made no allegation that the identities of these third-party civil servants are necessary to serve any compelling interest, such as confirming or refuting the existence of illegal activity.  *See Cooper*, 169 F. Supp. 3d at 37; *see also Martin v. DOJ,* 488 F.3d 446, 457 (D.C. Cir. 2007) (noting that "privacy interests are particularly difficult to overcome when law enforcement information regarding third parties is implicated").[18]

USPS also withheld portions of the report under Exemption 7(E).  *See* USPS Vaughn Index at USPS36; *see also* USPS 0454-456.  These portions of the report reflect USPIS practices and techniques for conducting postal inspections, the manner in which these inspections are conducted, and also the results of these specific inspections. *See* USPS Vaughn Index at USPS36.  Exemption 7(E) permits the agency to protect such "'methods of data collection, organization and presentation' contained in agency reports."  *Price v. DOJ*, No. 18-CV-1339 (CRC), 2020 WL

---

[18] The identities of these third-party individuals are also properly withheld under Exemption 6 for substantially the same reasons.  *See Roth v. DOJ*, 642 F.3d 1161, 1173 (D.C. Cir. 2011) (recognizing that "all information that would fall within the scope of Exemption 6 would also be immune from disclosure under Exemption 7(C)"); *accord DOJ v. Reps. Comm. For Freedom of Press*, 489 U.S. 749, 756 (1989) (recognizing Exception 7(C) is inclusive of, but also broader than, Exemption 6).

3972273, at *13 (D.D.C. July 14, 2020) (quoting *Blackwell*, 646 F.3d at 42); *see also Frank LLP v. CFPB*, 327 F. Supp. 3d 179, 183 (D.D.C. 2018) (collecting cases showing that "investigative questioning" can qualify as a "technique" or "procedure" under Exemption 7(E)).

Finally, USPS also asserts Exemption 7(E) over a document, also lodged within USPS36, titled "Election Offenses (Election Fraud) Typologies" published by USPIS's Criminal Investigations Group.  *See* USPS Vaughn Index at USPS36; *see also* USPS 0457-458.  This document summarizes different kinds of election fraud schemes for purposes of educating USPIS Inspectors engaged in preventing election mail fraud.  *Id.*  Its release would inform potential wrongdoers about which schemes USPIS agent are trained to find.  *Id.*  Releasing such training and educational materials "is tantamount to releasing information about the actual employment of the procedures and techniques themselves."  *CREW v. DOJ*, 160 F. Supp. 3d 226, 243 (D.D.C. 2016) (agreeing with government "that the training and equipment information, if disclosed, would reveal law enforcement techniques and procedures").  Exemption 7(E) therefore protects against disclosure of such training materials.  *See Elec. Priv. Info. Ctr. v. CBP*, 248 F. Supp. 3d 12, 19 (D.D.C. 2017) (holding that training materials were protected under Exemption 7(E)), *aff'd*, No. 17-5078, 2017 WL 4220339 (D.C. Cir. Aug. 1, 2017).

## IV.     Defendants Complied With The Foreseeable Harm Standard In The FOIA Improvement Act of 2016

The FOIA Improvement Act of 2016 requires that agencies "withhold information . . . only if . . . the agency reasonably foresees that disclosure would harm an interest protected by an exemption described in subsection (b)."  5 U.S.C. § 552(a)(8)(i)(I); *see also* H.R. Rep. No. 114-391, at 9 (explaining requires agencies to show it "has reasonably foreseen a specific, identifiable harm" before making a disclosure determination with respect to certain exemptions).  However, this standard codified existing government policy that had been in place for the better part of a decade.  H.R. Rep. No. 114-391, at 9 (noting that the policy was established by executive memoranda in 2009); S. Rep. No. 114-4 at 8 (same); Freedom of Information Act, 74 Fed. Reg. 4683 (Jan. 21, 2009) (presidential memorandum).  And DOJ already employed this standard when

defending agency withholdings in litigation. *See* H.R. Rep. No. 114-391, at 9; *accord* Attorney General Holder's Mem. for Heads of Exec. Dep'ts & Agencies Concerning the Freedom of Information Act, at 1–2 (Mar. 19, 2009), http://www.usdoj.gov/ag/foia-memo-march2009.pdf. Further, Congress expressly acknowledged that this amendment "does not alter the scope of information that is covered under an exemption." H.R. Rep. No. 114-391, at 10. Rather,  with respect to certain FOIA exemptions, § 552(a)(8)(A)(i)(I) simply requires agencies to identify a foreseeable harm to an interest protected within the existing scope of certain exemptions, in line with prior policy.

Treasury and USPS's declarations easily meet this standard for each category of withholdings asserted by the agencies.[19]  Beginning with Exemption 5, the deliberative process privilege exists to "prevent injury to the quality of agency decisions" by permitting "the withholding of all papers which reflect the agency's group thinking in the process of working out its policy." *Sears*, 421 U.S. at 151.  The privilege "encourage[s] the frank discussion of legal and policy issues within the government." *Access Reps.*, 926 F.2d at 1194.  As Treasury explains, its Exemption 5 withholdings include (1) discussions about whether and how to respond to the media; (2) an draft agenda preparing for Congressional testimony about COVID-19; (3) portions of a memorandum discussing plans and goals for matters unrelated to this FOIA request; (4) discussion of strategy related to coronavirus relief legislation; and (5) commentary on major problems and notable surprises in COVID-relief legislation.  *See* Dickerman Decl. ¶ 20.  With respect to these sensitive materials reflecting internal deliberative Treasury discussions about critical policy goals, Ms. Dickerman explained that "[r]elease of the information would cause reasonably foreseeable harm to Treasury in that it would chill similar future speech by Treasury officials."  *Id.*  In making this

---

[19] USPS is not obliged to show foreseeable harm for its Exemption 3 withholdings because the Act states that "[n]othing [in the Act] requires disclosure of information that is . . . otherwise exempted from disclosure under subsection (b)(3) [Exemption 3]." *Id.* § 552(a)(8)(B). USPS therefore "need not show foreseeable harm to withhold documents under Exemption 3." *Ctr. for Investigative Reporting v. Dep't of Treasury*, No. 19-CV-08181-JCS, 2021 WL 229309, at *7 (N.D. Cal. Jan. 22, 2021) (citing 5 U.S.C. § 552(a)(8)(B)).

determination, Treasury focused on the specific information at issue in concluding that disclosure would chill future speech. *Machado Amadis v. Dep't of State*, 971 F.3d 364, 371 (D.C. Cir. 2020) (finding agency provided adequate description of foreseeable harm). Moreover, given the preliminary and deliberative nature of these withholdings, "the chilling effect of public disclosure is in some sense self-evident." *Nat'l Laws. Guild v. ICE*, No. 17-CV-02448 (APM), 2020 WL 5798429, at *5 (D.D.C. Sept. 29, 2020) (finding agency adequately showed foreseeable harm).

USPS similarly explained that it determined there was a foreseeable harm in releasing the categories of Exemption 5 claims at issue. *See* Castorina Decl. ¶¶ 31-38; 53-55. Like the Treasury documents, these categories of records reflect sensitive internal agency deliberations about key agency priorities, including preparations for handling election mail (*id.* ¶ 32), handling media strategy for the announcement of Postmaster General DeJoy's selection (*id.* ¶ 33), handling media strategy regarding handling of election mail (*id.* ¶ 34), USPS's responses to OIG and GAO reports (*id.* ¶¶ 35-36), and ongoing business improvement initiatives and strategic future planning (*id.* ¶ 37). Exposing these internal agency deliberations would "having a chilling effect on internal and inter-agency deliberations and decision-making processes," *id.* ¶ 38, around such important agency initiatives and strategies and "would discourage the expression of candidate opinions and inhibit the free and frank exchange of information," *id.* ¶ 55; *see also Machadao Amadis*, 971 F.3d at 371; *Rosenberg v. Dep't of Def.*, 442 F. Supp. 3d 240, 260 (D.D.C. 2020) (finding agency adequately established foreseeable harm where declarant stated disclosure would inhibit "frank discussions" and impair efforts to furnish leadership with information required for effective decision making).

Defendants have made similarly persuasive showings with respect to Exemptions 6 and 7. As Ryan A. Law explains, releasing Secretary Mnuchin's alias email account username would reveal Secretary Yellen's current alias account, exposing her email account to potential bad actors who may try to either gain access to her account or flood it with spam, junk, or harassing emails. *See* Law Decl. ¶¶ 6-9, 11. Aiding malicious actors in potentially gaining access to Secretary Yellen's account would potentially reveal the "sensitive information" therein, including "information regarding her schedule, movements, and security detail" posing a security risk to her

and those around her.  *Id.* ¶ 11.  And release would further harm Secretary Yellen by undermining her ability to use her alias email account to conduct agency business due to greater exposure to volumes of irrelevant email.  *Id.* ¶¶ 5, 8.  Similarly releasing all or part of Secretary Mnuchin's personal email address would "constitute a clearly unwarranted invasion of his personal privacy," Dickerman Decl. ¶ 18, risking similar kinds of harm.  These explanations adequately establish the foreseeable harm necessary to justify Treasury's Exemption 6 and 7 withholdings.

Similarly, USPS properly withheld the email addresses and work cell phone numbers of USPS employees under Exemption 6 due to foreseeable harm such as increased probability of phishing attempts and increased risk of harassment.  *See* Castorina Decl. ¶ 41.  And with respect to its limited withholdings under Exemption 7, USPS similarly accounted for the harm experienced by third-party individuals who become associated with law enforcement activities, as well as the harm in revealing law enforcement techniques and methods.  *Id.* ¶¶ 47-49.

## V.    USPS Conducted An Adequate Search For Board of Governors' Records

CREW has further indicated that it intends to challenge the adequacy of USPS's search because it has identified several emails in which members of the Board of Governors used a personal email account.  *See, e.g.*, USPS 0018-21; 0023-25; 0033-35.  CREW alleges that USPS was therefore obligated to ask the Governors to search their personal email accounts for any responsive materials.  But as USPS explained to CREW, USPS's search took reasonable steps to capture any email records that might have included a Governor's personal email address.  *See* Castorina Decl. ¶¶ 17-20.  And importantly, because Board members are not USPS employees, they are not provided USPS email addresses and are expected to perform their duties using personal email addresses subject to USPS email regulations.  *Id.*  CREW has identified nothing in USPS's productions indicating the Governors, or anyone else, failed to comply with the relevant USPS email guidelines.

The adequacy of a search "is judged by a standard of reasonableness and depends, not surprisingly, upon the facts of each case."  *Weisberg v. DOJ*, 745 F.2d 1476, 1485 (D.C. Cir. 1984).  To survive a motion for summary judgment, an agency "must show that it made a good faith effort

to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Reps. Comm. for Freedom of Press v. FBI*, 877 F.3d 399, 402 (D.C. Cir. 2017) (quoting *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990)). "[T]he issue to be resolved is not whether there might exist any other documents possibly responsive to the request, but rather whether the *search* for those documents was *adequate*." *Weisberg*, 745 F.2d at 1485 (emphases in original). "'The agency has the initial burden to demonstrate the adequacy of its search, which it may meet by providing declarations or affidavits that are 'relatively detailed[,] . . . nonconclusory and submitted in good faith.'" *Landmark Legal Found. v. EPA*, 959 F. Supp. 2d 175, 181 (D.D.C. 2013) (quoting *Weisberg v. DOJ*, 705 F.2d 1344, 1351 (D.C. Cir. 1983)). "Once the agency has provided a reasonably detailed affidavit describing its search, the burden shifts to the FOIA requester to produce 'countervailing evidence' suggesting that a genuine dispute of material fact exists as to the adequacy of the search." *Hunton & Williams LLP v. EPA,* 248 F. Supp. 3d 220, 236 (D.D.C. 2017) (citing *Morley v. CIA*, 508 F.3d 1108, 1116 (D.C. Cir. 2007)).

USPS's supporting declaration makes clear it conducted an adequate search. USPS searched all emails going into and out of USPS email servers. *See* Castorina Decl. ¶¶ 17-20. And specifically, USPS searched its servers for *any* email containing a known Board member's email address as either sender or recipient. *Id.* Any responsive record in which a Governor used one of their known personal email accounts would have been included within the scope of this search. *Id.* While Board members do use non-USPS email accounts, USPS rules regarding their email use instruct Board members to copy specific USPS employees on any emails pertaining to USPS business. *Id.* ¶ 19. Board of Governors staff members reiterated and stressed the importance of this guidance specifically for emails relating to the search for a new Postmaster General in early 2020. *Id.* ¶ 20. These same staff members, who are the individuals best positioned to know the location of any responsive records, are confident that Board members complied with the relevant regulations and that all responsive records would have been within the scope of USPS's search.

*Id.*  USPS therefore executed a search "using methods . . . reasonably expected to produce the information requested."  *Reporters Comm. for Freedom of Press*, 877 F.3d at 400.

CREW's only countervailing evidence of the need for a broader search at this stage is the fact that several emails reflect this ordinary usage of personal email accounts by Board members. But as explained, that is how Board members are expected to perform USPS business in the ordinary course.  *See* Castorina Decl. ¶¶ 18-19.  These records therefore reflect the Board members complying with USPS rules requiring them to copy certain individuals on emails pertaining to USPS business.  *Id.*  CREW has identified no further evidence suggesting Board members failed to comply with these rules, and in the absence of such evidence government officials are "presumed to have properly discharged the duty to forward official business communications from a personal email account to an official email account." *Judicial Watch, Inc. v. DOJ*, 319 F. Supp. 3d 431, 437-438 (D.D.C. 2018) (citing cases).  A plaintiff may rebut this presumption but only "with something more than pure speculation."  *Competitive Enter. Inst. v. Off. of Sci. & Tech. Policy*, 241 F. Supp. 3d 14, 22 (D.D.C. 2017) (internal quotation marks omitted). CREW at this stage can offer no material dispute of fact about whether Board members properly adhered to rules requiring them to copy USPS employees on their USPS-emails.  For that reason, the Court should enter summary judgment that USPS performed an adequate search.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that the Court grant their motion for summary judgment.

Dated June 10, 2021                              Respectfully submitted,

                                                 BRIAN NETTER
                                                 *Deputy Assistant Attorney General*

                                                 ELIZABETH J. SHAPIRO
                                                 *Deputy Director*

                                                 /s/ *Christopher D. Dodge*
                                                 CHRISTOPHER D. DODGE
                                                 (MA Bar No. 696172)
                                                 *Trial Attorney*
                                                 U.S. Department of Justice
                                                 Civil Division, Federal Programs Branch
                                                 1100 L Street, NW
                                                 Washington, DC 20530
                                                 Telephone: (202) 598-5571
                                                 Email: christopher.d.dodge@usdoj.gov

                                                 *Counsel for Defendants*